**GRUPO PROTEXA, S.A., a company organized under the laws of the Republic of Mexico; and Condux S.A. de C.V., a company organized under the laws of the Republic of Mexico**

v.

**ALL AMERICAN MARINE SLIP, A DIVISION OF MARINE OFFICE OF AMERICA CORPORATION, a New York Corporation; AFIA, a Delaware Corporation; CIGNA, a Delaware Corporation.**

**Grupo Protexa, S.A., and Condux, S.A. de C.V., Appellants.**

No. 93–5332.

United States Court of Appeals, Third Circuit.

Argued Feb. 4, 1994.

Decided March 29, 1994.

Sur Petition for Rehearing April 28, 1994.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I. INTRODUCTION

This matter is before us on appeal from a judgment entered after we remanded the case to the district court when we reversed that court's prior judgment. The case involves claims by insureds under a marine insurance policy to recover the cost of removing their sunken vessel from a bay off the coast of Mexico. The policy covered costs for a removal of a sunken vessel if the removal was "compulsory by law." The insureds claimed they had acted under such compulsion because they were responding to an order to remove the wreck issued by the Mexican authorities. While certain of the several insurance carriers on the policy honored their claims, two denied liability. Thus, the insureds brought this action against those two companies. After a bench trial, the district court in a published opinion found in favor of the insurance companies on the ground that the removal was not "compulsory by law." In reaching this conclusion, the district court adopted an analytical framework not requiring it to determine the validity of the removal order.

The insureds appealed and we reversed the judgment of the district court, holding that it rested on incorrect conclusions of law. In particular we held that removal of the wreck would be "compulsory by law" if directed by a valid removal order. We then remanded the case for further proceedings. At a second bench trial, the district court incorporated its findings from the first trial and received additional evidence, including expert testimony concerning the validity of the order under Mexican and international law. In a subsequent unreported opinion, the district court held that the act of state doctrine did not bar the court's inquiry into the validity of the order. It also held, in a determination the insurance companies do not challenge, that the order, which was ambiguous as to whether it required the removal, in fact included that requirement. Ulti-

Kenneth M. Van Deventer (argued), Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for appellants.

Harold K. Watson (argued), Gregory F. Burch, Robin Beasley, Liddel, Sapp, Zivley, Hill & LaBoon, L.L.P., Houston, TX, David J. D'Aloia, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, for appellees.

Before GREENBERG and ROTH, Circuit Judges, and POLLAK, District Judge *.

* Honorable Louis H. Pollak, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

mately, however, the district court ruled in favor of the insurance companies, as it concluded that the order was invalid. The insureds again have appealed. We will affirm the district court's judgment, as we hold that the act of state doctrine does not bar our inquiry into the validity of the removal order, the order was in fact invalid, and there is no other basis on which we may conclude that the removal was compulsory by law.

## II. BACKGROUND

In our earlier opinion, *Grupo Protexa, S.A. v. All American Marine Slip*, 954 F.2d 130 (3d Cir.1992) (*Protexa Appeal I* ), we extensively recited the facts of the case as found by the district court in its published opinion following the first bench trial. *Grupo Protexa, S.A. v. All American Marine Slip*, 753 F.Supp. 1217 (D.N.J.1990) (*Protexa I* ). Furthermore, as we have indicated, the district court incorporated its findings from *Protexa I* into its unreported opinion following the second trial. *Grupo Protexa S.A. v. All American Marine Slip.*, No. 86–4212, 1993 WL 166275 (D.N.J. May 12, 1993) (*Protexa II* ). Therefore, many of the facts already appear in these two published opinions, so we freely will quote from them in setting forth the background of the case.[1]

The circumstances leading directly to this litigation may be traced to December 15, 1985, when the HUICHOL II (HUICHOL), a diving support vessel, sank with a large loss of life during a violent storm in the Bay of Campeche, an extension of the Gulf of Mexico, approximately 45 miles off the east coast of Mexico. The wreck of the HUICHOL came to rest 1.5 miles within the eastern border of the Petroleos Mexicanos' (Pemex) oil exploratory zone. Pemex is the Mexican national oil company. This area, though not Mexican territorial waters, is within the internationally recognized Mexican Exclusive Economic Zone, which extends 200 miles off shore. The HUICHOL was owned by Condux S.A. de C.V., a corporation owned by Grupo Protexa, S.A. (Protexa). Condux and Protexa are Mexican corpora-

tions and are the insureds under the policy involved in this case. Protexa is in the business of constructing and servicing the pipelines, platforms, and related structures needed by Pemex, and develops and manages these projects through Condux. For convenience, we will refer to the insureds together as "Protexa."

The HUICHOL was insured under a marine insurance policy with several layers of coverage. Under the policy, five percent of the risk was placed with a Mexican insurance company, and four primary-layer underwriters were responsible for the first $2,500,000 of covered loss. The excess-layer underwriters were responsible for losses exceeding $2,500,000. The excess-layer underwriters were All American Marine Slip (AAMS), which carried 30% of the excess layer, various Lloyds/London underwriters, which carried 65% of the excess risk, and CIGNA/AFIA, which had 5% of the excess layer. The insurance policy contained a standard wreck removal provision covering expenses Protexa incurred in the "removal of the wreck of the vessel ... when such removal is *compulsory by law.*" (Emphasis added.)

Protexa's insurance broker was notified on December 16, 1985, that HUICHOL had sunk the day before. The broker, acting as liaison between the underwriters and Protexa, then called in a specialized firm to survey the damage, adjust the loss, and prepare a written report for the underwriters. The representative from this marine surveying firm arrived at the wreck on December 16, 1985. On the same day, the insurance broker notified the underwriters on the policy, including AAMS and CIGNA/AFIA, that the HUICHOL had sunk and that it had called in the marine surveying firm.

When the marine surveying firm's representative arrived at the wreck he met with the various parties involved. Because the wreck lay in a Pemex zone of heavy drilling activity, and he believed that the Mexican government would want to remove the bodies of the deceased seamen and conduct an investigation, he concluded that the vessel

---

**1.** In order to make our opinion more readable, we usually will omit quotation marks of the quoted material as well as citations to the underlying opinions. We also in some instances will make nonsubstantive changes in the language quoted.

would have to be removed. The broker then sent a telex dated December 17, 1985, to Protexa suggesting that if the wreck were to be raised and moved, an immediate investigation should commence to determine if the removal was compulsory by law. The telex advised that a valid order of removal would have to be in writing and be issued by an authorized governmental authority. ·

Immediately after the sinking, the Mexican Procuraduria General de la Republica ordered an investigation of the sinking. On December 17, 1985, the Port Captain for Ciudad del Carmen and the offshore port of Cayo Arcas issued a written order that, according to the English translation, required Protexa to post a bond "to guarantee the cleaning up of the area and the salvaging of [the] Vessel." [2] *Protexa Appeal I,* 954 F.2d at 132–33. Ciudad del Carmen is a city on the mainland near the place where the HUICHOL sank.

Protexa's representative interpreted the Port Captain's order as requiring immediate removal of the wreck, and on the same day the order was issued, he so notified Protexa's insurance broker and requested an immediate meeting so that the broker could present the removal order to the underwriters. The insurance broker notified all the underwriters, including AAMS and CIGNA/AFIA, of the removal order. Protexa also wanted to present its proposal to perform the removal without resort to a third-party salvor.

The broker, the marine surveying representative, and Protexa's representative met in Houston on December 18, 1985, where they agreed that the order appeared to require removal of the wreck and that Protexa's proposed removal plan was sound. The broker attempted to telephone the underwriters to discuss the proposed plan, but was able to contact only three of them, not including AAMS or the Lloyds/London underwriters. The broker explained to the underwriters the circumstances of the removal order and the need for beginning removal of the wreck without delay in order to minimize expenses. The underwriters he reached agreed to waive any requirement that Protexa obtain a second or third salvage bid, and advised that Protexa should begin work immediately to avoid further complications and costs.[3]

Protexa presented the underwriters with two alternatives regarding the costs of removal: (1) a fixed-sum bid to remove the wreck for $3,785,000 or (2) a daily rate of $224,608 for an estimated period of 24 days, resulting in a cost of approximately $5.4 million. The marine surveying representative sent these offers to the underwriters by telex on December 19, 1985, and the wreck removal operation began on that day. By December 20, 1985, all of the underwriters except AAMS and CIGNA/AFIA had agreed to the lump-sum bid predicated on there being a consensus · in favor of this option. CIGNA/AFIA took no position, and AAMS, instead of accepting either of the alternatives posed by Protexa, responded by advising that all necessary steps should be taken to minimize the loss. Furthermore, AAMS expressed its desire to have a third-party salvor involved to the extent possible in the removal of the wreck. Inasmuch as AAMS and CIGNA/AFIA had not approved the lump-sum bid, the broker and the marine surveying representative told Protexa that it should consider the job to be on a day-rate basis.

On December 20, 1985, a Protexa staff attorney, Jorge Uriarte, whom Protexa chose to review the Port Captain's order, arrived in the port of Carmen. Upon his arrival he was told of the Port Captain's order, of the underwriters' approval of Protexa to raise the wreck, and of an imminent meeting with family members of the crew to announce that Protexa would be raising the wreck. Nevertheless, before Protexa started wreck removal, it wanted to rule out the possibility of a

---

**2.** We have repeated the full text of the order in the appendix to this opinion.

**3.** Prior to this meeting and telephone contact with the underwriters, the broker sent Protexa a

telex strongly suggesting that Protexa obtain at least one, and preferably two, outside bids for the salvage of the vessel. He also reminded Protexa of its obligation to act as a prudent uninsured.

legal challenge to the order.[4] After a 45–minute review of the order and the statutes which defined the office of the Port Captain and the duties of his office, Uriarte concluded that "it was clear beyond a doubt that the order had to be complied with." Uriarte then visited the office of the Port Captain in an effort to obtain suspension or rescission of the order but was informed that any such relief would have to be sought from officials in Mexico City. He also was informed that the Port Captain expected removal to begin without delay or the navy would take over the removal and Protexa would be punished to the full extent of the law.

In addition to providing Protexa with an opinion as to the validity of the removal order, Uriarte listed five potential consequences that could result from noncompliance: (1) if Protexa did not begin removal of the vessel immediately, the Mexican government could arrange to have the wreck removed and present Protexa with the bill; (2) Protexa faced the potential for catastrophic liability to third parties for any damage resulting from movement of the wreck within the oil field; (3) Protexa would face potential sanctions or fines, which could be imposed on a sliding scale, for failure to comply with the removal order and to cooperate with the investigation; (4) Protexa risked forfeiture of the vessel and the bond; and (5) Protexa risked the destruction of its goodwill with the government and with Pemex if it failed to comply with the order. After concluding that the removal order was valid and, after weighing the potential consequences of noncompliance, Protexa decided not to challenge the order.

Although Protexa initially estimated that removal of the wreck would take about three weeks, the operation ran into several problems and progress was exceedingly slow. But Protexa lifted and suspended the wreck in a crane on February 10, 1986. Eventually, Protexa placed the wreck on the sea bottom in shallow water outside the oil exploratory zone.

After Protexa completed the removal, the marine surveying firm prepared its final proof of loss and forwarded copies to all the

underwriters. The total adjusted loss was $12,121,726, with the first $2,500,000 paid by the primary-layer underwriters, thereby leaving a balance of $9,631,726, 5% of which remained with the Mexican insurer. The Lloyds/London underwriters, which satisfied their portion of Protexa's claim, owed and paid 65% of the remaining 95% of $9,631,726. Thus, if liable, AAMS and CIGNA/AFIA respectively would owe 30% and 5% of the remaining 95%. Both AAMS and CIGNA/AFIA, however, denied Protexa's claim.

Protexa filed a complaint in the United States District Court for the District of New Jersey against AAMS and CIGNA/AFIA, and subsequently moved for summary judgment, contending that it could recover the removal costs because the removal was "compulsory by law." Relying on cases construing this standard policy language, Protexa argued that the Port Captain's order in itself established conclusively that the removal was compulsory by law. Protexa also maintained that the act of state doctrine precluded the court from questioning the Port Captain's authority to order the removal.

AAMS and CIGNA/AFIA filed cross-motions for summary judgment. They argued that the cases adopted a balancing test of reasonableness in which three factors: the likelihood of exposure, the sanctions for failure to remove, and the cost of removal, must all be examined in order to determine if removal was compulsory by law. Thus, they maintained that even a valid removal order would not show conclusively that removal was compulsory by law. They argued, however, that the Port Captain's order was invalid, and that therefore there was no likelihood of exposure to sanctions for failure to remove the HUICHOL. They also contended that the act of state doctrine was inapplicable, and thus that they could challenge the validity of the order.

In an unpublished opinion filed on August 26, 1988, the district court denied both motions for summary judgment. The case proceeded to a bench trial, following which the court, in *Protexa I* explained its interpretation of when removal is compulsory by law:

---

**4.** Protexa actually started removing the wreck before Uriarte reached Carmen.

[T]he determination of whether removal of a vessel was 'compulsory by law' must be decided by looking to the state of affairs as they would appear to a reasonable owner under the circumstances and examining whether failure to remove a wreck would likely expose such owner to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal. In other words, in this action, would a reasonable owner faced with the Port Captain's December 17, 1985 Order (the 'Order'), determine that failure to remove the HUICHOL would likely expose it to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal.

*Protexa I*, 753 F.Supp. at 1230. Under this formula, the district court believed that the absence of governmental authority to order removal of the wreck would not be necessarily issue-dispositive but rather would be merely one of the factors the court would consider in determining whether removal of the HUICHOL had been compulsory by law. *Id.* at 1228. Consequently, the district court assumed without deciding that the Port Captain's removal order was valid, and the court did not confront the act of state doctrine. *Id.* at 1228.

Nevertheless the court held for the insurance companies, as it concluded that the removal was not compulsory by law under the foregoing formula. The court stated that "no phrase in the body of the [Port Captain's] order direct[ed] wreck removal." *Id.* at 1232–33. The court observed that the order instead merely required the posting of a bond. *Id.* at 1233. The court suggested that Protexa did not consider adequately the possibility of challenging the order. In this regard it pointed out that inasmuch as Ur-

iarte had no training in the applicable areas of law, did not obtain expert advice, and concluded that the order was valid after only cursory review, he was not prepared properly when he met with the Port Captain. *Id.* at 1233–34. In addition, the court found that the potential sanctions for noncompliance with the order and the potential liability to third parties were much less than the cost of removal. *Id.* at 1236. Furthermore, the court suggested that factors other than legal compulsion—pressure from the families of the deceased seamen and the possible commercial consequences of noncompliance—influenced Protexa's decision not to resist the Port Captain's order. *Id.* at 1232.[5]

Protexa then filed its first appeal to this court. We reversed the judgment of the district court and remanded for further proceedings. *Protexa Appeal I*, 954 F.2d 130. We first addressed whether removal of the HUICHOL was "compulsory by law," and in this undertaking we reviewed four opinions of courts of appeals interpreting the phrase as used in a standard clause in marine insurance contracts. See *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500 (2d Cir.1972); *Progress Marine, Inc. v. Foremost Ins. Co.*, 642 F.2d 816 (5th Cir.), cert. denied, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365 (5th Cir.1983); and *East Coast Tender Serv., Inc. v. Robert T. Winzinger, Inc.*, 759 F.2d 280 (3d Cir. 1985). Ultimately, we determined that removal may be considered compulsory by law in any of three circumstances: (1) if it is directed by government order; (2) if it is required by statute or regulation; or (3) if "a reasonable shipowner at the relevant time would determine that the probable cost of removal would be less than the probable tort

---

5. The court also held for the insurance companies on a second ground. As we explained in *Protexa Appeal I:* "The court next held that even if the removal had been 'compulsory by law,' Protexa was not entitled to recover due to a policy provision that the court interpreted to mean that Protexa lost all right to recovery if it breached its duty to act as a prudent uninsured. The court found that Protexa violated this duty '[w]hen [it] acted as its own salvor.' [753 F.Supp.] at 1237. Among other things, the court

noted that 'Protexa had no experience in deep water wreck removal operations,' ignored AAMS' request that a third-party salvor be involved as much as possible, ignored bids by experienced salvors that were much lower than Protexa's costs, did not properly execute its removal plan, and failed to implement recommendations by an experienced salvor. *Id.* at 1237–39." 954 F.2d at 135. This ground of the district court's first decision is not at issue in the present appeal.

liability if removal was not undertaken." 954 F.2d at 138.

Consequently, we reversed the judgment of the district court because it had adopted a test different from our interpretation of the case law and had assumed the validity of the order and yet found for the insurance companies. Inasmuch as a removal directed by a government order is compulsory by law, we stated that "if the Port Captain's order in this case was a valid removal order, Protexa was entitled to recover under the policy provision in question." 954 F.2d at 138. We therefore remanded the case for a finding of whether the order required removal and a determination of the validity of the order.[6]

Inasmuch as we remanded the matter to the district court to determine the validity of the order, we did not pass on the insurance companies' contention that the Port Captain lacked the authority under Mexican law and under the United Nations Convention on the Law of the Sea (UNCLOS) to order the removal of the wreck. Furthermore, we did not address the merits of Protexa's argument that the act of state doctrine precluded an American court from inquiring as to the va-

lidity of the Port Captain's order. The district court was to determine that issue, too, on the remand, on which it would also decide whether the Port Captain's order directed removal of the wreck. *Protexa Appeal I*, 954 F.2d at 139.[7]

On remand, the district court in its unpublished opinion, *Protexa II*, again found for the insurance companies. The court first made the now unchallenged finding that the Port Captain's order was a directive to raise the HUICHOL. The court further stated that "[w]hile arguably the act-of-state doctrine could be applied here, caution and fundamental fairness counsel against the use of this judicially fashioned remedy." *Id.* at 140. The court held that the policies underlying the doctrine were not implicated in this case and that "for reasons of fair play and fundamental justice," Protexa should not be permitted to utilize the doctrine "as a sword rather than a shield" to bar the insurance companies from asserting a defense that the order was invalid.[8] Finally, the court determined that the Port Captain's order was invalid under Mexican law and therefore could not constitute legal compulsion under

---

**6.** Because it did not need to address the issue under the analytical framework it had adopted, the district court had not made the initial determination as to whether the removal order was in fact an order to raise the wreck, as opposed to an order merely to post a bond. In remanding on this issue, we noted that under Fed.R.Civ.P. 44.1, expert testimony may be introduced regarding Mexican law to aid the court in interpreting the Port Captain's order. *See Merck & Co. v. U.S. Int'l Trade Comm'n*, 774 F.2d 483, 488 (Fed.Cir. 1985).

**7.** However, we did note that "[t]he act of state doctrine does not preclude a court from determining whether in fact a government official directed certain action. *See [W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400, 409, 110 S.Ct. 701, 706–07, 107 L.Ed.2d 816]; *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291, 1301 (D.Del. 1970) ('whether or not a foreign official "ordered" certain conduct is an evidentiary question' not prohibited by the act of state doctrine)." 954 F.2d at 139 n. 5.

The district court's second and independent reason, *see* footnote 5, *supra*, that Protexa did not act as a prudent uninsured, for entering judgment for the insurance companies is not at issue in the present appeal. However, in respect to this point, we held that the district court erred in

interpreting a provision in the contract to mean that Protexa lost all right to recover any removal costs when it breached its duty to act as a prudent uninsured. *Id.* at 139–40. Instead, we found that the language relied upon by the district court appeared to refer only to the settlement of claims and not to the issue of coverage. *Id.* at 140. Therefore, although we held that the district court's findings that Protexa's removal operation was highly inefficient were not clearly erroneous, we stated that Protexa's inefficiency did not totally preclude recovery of removal costs. *Id.* at 141.

We stated, however, that "the policy provision on removal may well be restricted to reasonable removal costs, and it is not apparent from Protexa's briefs that it disputes such an interpretation." *Id.* at 140. Consequently, we also remanded for the district court to "determine the meaning of this provision and, if the provision is limited to reasonable costs, [to] make findings regarding the amount of those costs." *Id.* Of course, the district court on remand did not have to reach this issue.

**8.** *Id.* 954 F.2d at 141. Resting its decision with respect to the act of state doctrine on these points, the court did not reach the insurance companies' argument that the act of state doctrine should not apply because the order directed activity outside of Mexican territory.

the policy. The court therefore entered judgment for the insurance companies on May 14, 1993.

Protexa again appeals. We have jurisdiction under 28 U.S.C. § 1291, and we apply a plenary standard of review to the district court's interpretation of the insurance policy and its application of controlling legal principles, as the facts germane to the resolution of this matter are not in dispute. *See New Castle County v. Hartford Accident and Indem. Co.*, 933 F.2d 1162, 1183 (3d Cir.1991).[9] "However, 'in reviewing factual findings made by a district court, we apply the clearly erroneous standard set out in Fed.R.Civ.P. 52(a).'" *Id.* (quoting *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 128 (3d Cir.1985), *aff'd*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)). We will affirm the judgment of the district court.

## III. COMPULSORY BY LAW

We first address Protexa's argument that the district court erred in basing its decision on the remand on the finding that the order was invalid. According to Protexa, the case law construing the phrase "compulsory by law" provides that legal compulsion may be found through a "rule of reason" analysis, in which the technical invalidity of the removal order does not necessarily dispose of the coverage issue. Protexa states that the appropriate inquiry under this broader interpretation is whether a reasonable insured shipowner in circumstances such as those in this case would conclude that "removal was reasonably required by law, or ... failure to remove would have reasonably exposed [the] insured to liability imposed by law sufficiently great to justify the expense of removal." Protexa Br. at 12 (quoting *Progress Marine, Inc.*, 642 F.2d at 820). Consequently, Protexa argues that even if the removal order was "technically invalid," Protexa still reasonably was required by law to remove the wreck because it believed it had to comply with the order. Therefore, it is entitled to recover under the policy. This argument

makes liability dependent on Protexa's subjective state of mind.

The insurance companies respond that our prior opinion determined the law of the case, namely, that "removal of the HUICHOL was 'compulsory by law' if removal was directed by a valid order of the Port Captain." *Protexa Appeal I*, 954 F.2d at 141. They therefore contend that Protexa's argument is barred because Protexa is arguing, based solely on the invalid removal order, that removal was nevertheless compulsory by law because Protexa reasonably believed it had to obey the order. The insurance companies then state that under the case law Protexa must either show that the removal order was valid, or else meet the balancing test and show that the likelihood and severity of sanctions justified the cost of removal. AAMS Br. at 11. While it might appear that the insurance companies' balancing test is not significantly different from the test advanced by Protexa, in fact it is more demanding, as it is objectively based.

Of course, the district court rejected Protexa's claim under the objective balancing test at the first trial when it held that the potential sanctions for noncompliance with the order and potential liability to third parties were much less than the cost of removal of the wreck. We did not disturb these findings in *Protexa Appeal I*, and the district court adopted these findings at the second trial. Thus, if the objective balancing test is adopted, Protexa can prevail only if it can successfully challenge those findings, or if the removal was compulsory by law because the order was valid, or if the insurance companies are barred by the act of state doctrine from challenging the validity of the order.

Even assuming Protexa is not foreclosed by the law of the case from advancing its argument that the removal was compulsory by law on the ground that it reasonably complied with the removal order, we do not read the case law to support the application of a "rule of reason" analysis of the subjective sort Protexa advances. It appears that

---

9. Neither party suggests that we must be concerned with the somewhat elusive distinction between construction and interpretation on this appeal, *see Ram Constr. Co. v. American States Ins. Co.*, 749 F.2d 1049, 1052–53 (3d Cir.1984), and, as we are affirming the judgment, Protexa, as the appellant, cannot be prejudiced by our exercise of plenary review.

Protexa has misconstrued the meaning and application of certain language in *Progress Marine* to call for an improper examination into its corporate state of mind.

Protexa is correct in stating that this court and the Court of Appeals for the Fifth Circuit have adopted a test for determining whether removal is "compulsory by law" that encompasses cases beyond the *per se* rule of a valid governmental order. However, in quoting *Progress Marine* to support its argument that it believed "removal was reasonably required by law," Protexa has taken this phrase out of its original context and given it a much broader, unintended meaning. Rather, as we discuss below, the phrase refers specifically to a situation in which there are particular statutes and/or regulations which direct the insured to remove a wreck even though a removal order has not been issued. Alternatively, the phrase refers to a situation in which the costs which would flow from not removing the wreck would justify the expenditure to remove it.

In *Progress Marine,* the Court of Appeals for the Fifth Circuit adopted an interpretation of the phrase "compulsory by law" going beyond the restrictive interpretation of the Court of Appeals for the Second Circuit that a removal was compulsory by law if directed by a governmental order. *See Seaboard Shipping Corp.,* 461 F.2d at 504. As we explained in *Protexa Appeal I,* in *Progress Marine* a barge sank about 11 miles off of the Louisiana coast, the hurricane season was approaching, and the submerged barge posed a threat both to navigation and to neighboring oil production facilities and workers. But there was no governmental order requiring removal. *Protexa Appeal I,* 954 F.2d at 136. In holding that compulsory by law is not restricted to situations in which a direct government order has been issued, the *Progress Marine* court expanded the term to encompass situations in which "*removal was reasonably required by law,* or where failure to remove would have reasonably exposed an insured to liability imposed

by law sufficiently great to justify the expense of removal," 642 F.2d at 820 (emphasis added). By a situation in which "removal was reasonably required by law," the court referred to statutory or regulatory sources of law which arguably required removal. As a demonstration of this understanding, the *Progress Marine* court went on to discuss the various statutes and possible tort actions that the barge owner reasonably could have believed either compelled him to remove the barge or subjected him to potential tort liability for "enormous damages." 642 F.2d at 820–21.

Furthermore, we already have stated explicitly that the phrase "reasonably required by law" in *Progress Marine* refers specifically to statutory or regulatory duties. In *East Coast Tender Serv.* we recounted the *Progress Marine* holding by quoting the phrase "reasonably required by law" and inserting bracketed language stating: "[*i.e.,* a legal duty imposed by statute]." *East Coast Tender Serv.,* 759 F.2d at 286.[10] Applying this analysis, we addressed the argument that the charterer of barges sunk in the Delaware River was compelled to remove them by New Jersey trespass and nuisance statutes requiring removal of sunken barges from state riparian lands. *Id.* 759 F.2d at 285–87.

Finally, in *Continental Oil* the Court of Appeals for the Fifth Circuit held that "[r]emoval of a wreck is not compulsory by law unless there is a clear legal obligation to remove, *imposed by statute or by judicial decision,* on the party who effects removal." *Continental Oil,* 706 F.2d at 1377 (emphasis added). Because the insured had not demonstrated that there was such an obligation or that governmental authorities had ordered removal of the wreck, the court held that removal was not covered by the insurance policy in question. *Id.* In making its analysis, the court again looked to possible statutory and judicial bases for imposing both criminal and civil liability upon the insured.

---

10. The full quote stated:

The court concluded that removal is 'compulsory by law' when it is 'reasonably required by law, [*i.e.,* a legal duty imposed by statute], or

where failure to remove ... reasonably expose[s] an insured to liability imposed by law sufficiently great to justify the expense of removal....' *Id.*
*East Coast Tender Serv.,* 759 F.2d at 286.

Thus, we believe that Protexa mistakenly has construed the language of the case law too broadly to embrace a "rule of reason" analysis of the subjective sort it describes. Rather, contrary to Protexa's position, the language it quotes from *Progress Marine* refers to the second two elements of the test for determining whether removal was subject to legal compulsion which we recognized in *Protexa Appeal I, i.e.,* removal required by statute or regulation or by the objective balancing test involving a comparison of the costs of removing and not removing the wreck.[11] Of course, in this case there is no self-executing statute or regulation requiring removal and the district court in unassailable findings rejected Protexa's claim under the objective balancing test. Thus, Protexa can establish that the removal was compulsory by law only if it can establish that the Port Captain's order was valid.

Because we have determined that the district court was not compelled by precedent to

engage in a "rule of reason" analysis of the sort advocated by Protexa, we do not need to determine whether Protexa could recover if that test were applicable. However, we note that Protexa's argument that an *apparently* legal order may alone create legal compulsion seems problematic for several reasons. First, our opinions in *East Coast Tender* and *Protexa Appeal I* do not make any reference to giving weight to the facial validity of a removal order. Second, in *Continental Oil* the Court of Appeals for the Fifth Circuit specifically eliminated what was originally a subjective component to the *Progress Marine* test,[12] and it appears to us that Protexa's argument would revive such an inquiry. Third, even if a subjective "rule of reason" analysis were appropriate, the factual findings of the district court demonstrate that Protexa did not take the steps necessary to arrive at a reasonable conclusion as to the validity of the removal order once it had been issued.[13] The situation the district court de-

---

**11.** In *Protexa Appeal I,* after reviewing the *Seaboard Shipping Corp., Progress Marine, Continental Oil,* and *East Coast Tender* decisions, we stated:

> In sum, we interpret all of the decisions described above to mean that removal is 'compulsory by law' if it is directed by government order. Our decision in *East Coast Tender Serv.,* and the two earlier Fifth Circuit decisions interpret this phrase to encompass *additional* cases, *viz.,* those in which removal is required by statute or regulation, and those in which a reasonable shipowner at the relevant time would determine that the probable cost of removal would be less than the probable tort liability if removal was not undertaken. Accordingly, if the Port Captain's order in this case was a valid removal order, Protexa was entitled to recover under the policy provision in question.

*Protexa Appeal I,* 954 F.2d at 138 (emphasis original).

**12.** The subjective element of the *Progress Marine* test had inquired "whether removal was performed as a result of a subjective belief on the part of the insured that such was reasonably necessary...." *Continental Oil Co.,* 706 F.2d at 1371 (quoting *Progress Marine,* 642 F.2d at 820).

**13.** We need merely accept the district court's factual findings to arrive at this understanding. The district court was very critical of the actions of the Protexa attorney who reviewed the order, determined its validity, and recommended that it should not be challenged:

> Uriarte's review of the Order and the applicable statutes contained in the Order within the span of 45 minutes. He then concluded the Order was valid and he and other Protexa representatives announced to those assembled that the wreck would be removed. Uriarte had no training in admiralty law and was unfamiliar with the United Nations Convention of the Law of the Sea. He also failed to engage in an effort to seek the counsel of someone who in fact did possess maritime legal experience. At this point in time Protexa anticipated spending a minimum of $3,785,800 to a maximum of $5,390,592 for wreck removal and relief upon nothing more than an oral opinion from a staff attorney. For Protexa to proceed in this fashion is not only extraordinary but incredible and casts serious doubt on the exercise of its corporate judgment.

*Protexa I,* 753 F.Supp. at 1233. Moreover:

> Uriarte's visit to the Port Captain's office was a *pro forma* appearance but of little substance. He was so ill-prepared and uninformed that his application was doomed to failure even before it was presented. For example, he was unaware of whether the Mexican government had any means at its disposal to remove the HUICHOL. He did not know what a third-party salvor would charge to remove a wreck. No one at Protexa had told him what it was going to cost Protexa to remove the wreck. He was unaware that three miles separated the HUICHOL from a Pemex platform or related structure. In terms of sanctions, he admitted that forfeiture of the HUICHOL to the government was not a sanction that required the Order to be obeyed. Protexa further stipulated

scribed in its findings on this point can be contrasted to the procedures normally followed in a wreck removal situation, as described in the expert testimony at the first bench trial. *See Protexa I*, 753 F.Supp. at 1233–36.

Even though we do not accept Protexa's argument that an apparently valid order can create legal compulsion, we recognize that Protexa has raised a significant point, *viz.*, that the actions of a party faced with such an order should not be evaluated *ex post* according to a standard stricter than that applied under the objective balancing test to an insured's actions in removing a wreck when no order has been issued. We do not understand case law as having foreclosed the possibility that an apparently valid removal order, ultimately determined to be invalid, can be factored into the objective test of balancing probable liability versus removal costs to determine legal compulsion. While discussions of probable liability in the cases we have cited focused on tort liability, none of the courts dealt with a case in which there had been a removal order.

■ Thus, although we now do not decide the issue conclusively, it would seem reasonable to factor the probable sanctions for disobeying an ostensibly valid removal order into the balancing test for determining whether removal is compulsory by law, and this opinion should not be taken as foreclosing that possibility. Hence, removal could be considered "compulsory by law" even in the face of a government order later determined to be invalid, so long as on an objective analysis the reasonable costs of disobeying the order and the probable tort liability outweigh the removal expenses.

■ Nevertheless if we apply this standard and factor the existence of the removal order into the objective balancing equation, we still would not consider that the removal of the HUICHOL was "compulsory by law." We predicate this conclusion on the finding of the district court in *Protexa I* that even assuming the removal order was valid, Protexa did not satisfy the balancing test the court applied.[14] We reiterate that although we reversed the district court's original judgment on the ground that it applied an improper standard, we now accept its findings of fact that supported its determination, as the district court's opinion on the remand readopted these fully justified findings. *Protexa II* at 5.

In reaching our result that the removal was not compulsory by law under the objective balancing test, we have not lost sight of the fact that the sinking of the HUICHOL was a tragic event. We well understand why Protexa believed it should raise the wreck. However, we must stress that the issue before us is whether or not Protexa is entitled to recover the costs of removing the wreck under its insurance policy. Although Protexa clearly was under tremendous moral and commercial pressure to raise the wreck, *see Protexa I*, 753 F.Supp. at 1228, these factors do not tend to establish that removal was compulsory by law under the terms of the insurance policy. Accordingly, inasmuch as we reject Protexa's case insofar as based on the objective balancing test, Protexa can only recover if the order is unassailable un-

that the threat of fines was not the primary motivating factor for the removal of the wreck. Without further belaboring this opinion with Uriarte's cross-examination, it is important to note that he did not make a technical presentation to the Port Captain pertaining to the wreck constituting a hazard to navigation. The commercial and moral implications that AAMA asserts motivated Protexa to remove the wreck are documented in Uriarte's cross-examination.

*Id.* 753 F.Supp. at 1234 (citations to trial transcript omitted).

**14.** The district court stated:

The sanctions [envisioned by Protexa in making its decision] were in fact meaningless and lacked persuasive value. Removal of the HUICHOL by the Mexican government or through a third-party salvor in light of the [very high] Protexa-estimated cost of removal was no sanction. The potential for catastrophic liability to third-parties if the wreck were to move within the oil field was remote, particularly in view of the three mile distance between the wreck and any Pemex installation.... The sanctions of fines and the risk of loss of the bond amounted to approximately $50,000. They could not in this factual scenario, either individually or cumulatively, amount to a sanction.

*Protexa I*, 753 F.Supp. at 1236.

der the act of state doctrine or if it was in fact valid. Thus, we now turn to Protexa's argument that the act of state doctrine prohibits judicial inquiry into the validity of the order.

## IV. ACT OF STATE

As we have indicated, in *Protexa Appeal I* we did not determine whether the act of state doctrine barred the insurance companies from challenging the validity of the removal order. On the remand, the district court addressed the issue and held that "[w]hile arguably the act-of-state doctrine could be applied here, caution and fundamental fairness counsel against the use of this judicially fashioned remedy." *Protexa II* at 40.

In its analysis, the court first stated that the policies underlying the doctrine—"international comity, respect for sovereign nations on their own territory and deference to the executive branch in the administration of foreign policy"—were not implicated inasmuch as this case involves an insurance dispute between private parties of no interest to the governments of Mexico or the United States or to the international community.[15] Second, the district court found the doctrine inapplicable, because Protexa was attempting to use it "as a sword rather than a shield." *Id.* at 41. The court interpreted the case law as teaching that for reasons of fair play and fundamental justice, a court is reluctant to invoke the doctrine on behalf of a party seeking relief. In this regard it noted that Protexa chose to bring the action in federal district court in New Jersey, and thereby deprived a Mexican court of the opportunity to adjudicate the validity of what to that court would have been a domestic order, the review of which could not have implicated the act of state doctrine. Thereafter Protexa defended its selection of an American forum by resisting the insurance companies' motion to dismiss predicated on *forum non conveniens*. The district court held that in these circumstances "it would be unjust to permit

Protexa the benefit of an American forum and the protection of a doctrine that would unfairly impede the defendants in their ability to assert a defense." *Id.* In view of these conclusions the court did not reach a contention advanced by the insurance companies that the doctrine by its terms could not be applicable, as the order of remand directed conduct to be taken outside of Mexican territory.

On this appeal Protexa again argues that the act of state doctrine applies, so that the Port Captain's order must be considered a valid act of the Mexican government. Protexa contends that this case involves more than a mere insurance coverage dispute for several reasons. First, it claims that the district court ruled as a matter of law that the Mexican government does not possess the legal right to order a Mexican corporation to raise its own wreck from offshore oil fields under Mexico's jurisdiction. Second, Protexa claims that an issue of Mexican policy is at stake, namely, that nation's powers within the 200–mile Exclusive Economic Zone (EEZ). The EEZ is a maritime boundary established under UNCLOS, and comprises an area beyond and adjacent to the territorial sea, subject to the specific legal regime set forth in UNCLOS.

Protexa also correctly notes that the sinking immediately caught the government's attention, leading to the removal order. Protexa further reasons that Mexico has not demonstrated more recent interest in the implementation of the Port Captain's order because Protexa complied with it. Consequently, Protexa asserts that the decision of the district court represents "a breathtaking intrusion into matters of Mexican sovereignty and jurisdiction in its EEZ and over its own citizens" and that it was clear error for the court not to apply the doctrine. Protexa Br. at 21.

Protexa also argues that the trial court invented a fairness exception to the doctrine "without precedent in any controlling case law" and "clearly contrary to the mandate of

---

15. The court stated that the decision of the Port Captain on a purely local matter eventually will determine who will pay for the wreck removal, and that in examining the validity of this decision

the court "is not creating principles of domestic and international law, but is applying them as they have been promulgated by their respective entities." *Id.* at 41.

the act of state doctrine." *Id.* at 21. Rather, Protexa claims, the history of the doctrine shows that the judicially-created act of state doctrine puts the interests of amicable and orderly relations between nations before considerations of fairness to private litigants. Thus, Protexa asserts that the doctrine would be ineffective if it could be circumvented simply because its implementation would be unfair to the party prevented from challenging the act of the foreign state.

Finally, Protexa responds that its choice of an American forum was entirely appropriate. It points out that the insurance companies are United States corporations with no assets or presence in Mexico, the insurance policy was issued by an agent in the United States for a premium in United States dollars, and the final adjustment was undertaken by a United States firm and determined in dollars. Furthermore, Protexa observes that even if it obtained jurisdiction over the insurance companies in Mexico, it still would have to execute any judgment it obtained in the United States. Protexa Br. at 23–24.

██ We therefore *turn to* an analysis of the act of state doctrine and its applicability in this case. As we have stated:

Under the [act of state] doctrine, the courts of this country will refrain from judging the validity of a foreign state's governmental acts in regard to matters within that country's borders.

*Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1057–58 (3d Cir. 1988) (citations omitted) (*Environmental Tectonics Circuit Op.*), aff'd, *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.,* 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (*Environmental Tectonics S.Ct. Op.*). "The act of state doctrine is not some vague doctrine of abstention but a 'principle of decision binding on federal and state courts alike.' " *Environmental Tectonics S.Ct. Op.,* 493 U.S. at 406, 110 S.Ct. at 705 (quoting *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964)). "Act of state issues only arise when a court must decide—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *Envi-*

*ronmental Tectonics S.Ct. Op.,* 493 U.S. at 406, 110 S.Ct. at 705.

Regarding the foundation of the doctrine, the Supreme Court has explained:

This Court's description of the jurisprudential foundation for the act of state doctrine has undergone some evolution over the years. We once viewed the doctrine as an expression of international law, resting upon 'the highest considerations of international comity and expediency,' *Oetjen v. Central Leather Co.,* 246 U.S. 297, 303–304, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). We have more recently described it, however, as a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs, *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964).

*Environmental Tectonics S.Ct. Op.,* 493 U.S. at 404, 110 S.Ct. at 704. "Therefore, the application of the doctrine depends on the likely impact on international relations that would result from judicial consideration of the foreign sovereign's act." *Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 520–21 (2d Cir.), *cert. dismissed,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). "For this reason, the Supreme Court has not laid down rigid rules to govern the doctrine's application, but leaves it to the lower courts to determine whether a conflict between the judicial and political branches exists in a particular case." *Environmental Tectonics Circuit Op.,* 847 F.2d at 1058. "If adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act." *Allied Bank Int'l,* 757 F.2d at 521 (citing *Sabbatino,* 376 U.S. at 427–28, 431–33, 84 S.Ct. at 939–40, 941–43; *Garcia v. Chase Manhattan Bank,* 735 F.2d 645, 651 (2d Cir.1984)).

██ We acknowledge that, as the district court recognized, the act of state doctrine arguably is applicable in this case. However, "sometimes, even though the validity of the act of a foreign sovereign within its own

territory is called into question, the policies underlying the act of state doctrine may not justify its application." *Environmental Tectonics S.Ct. Op.,* 493 U.S. at 409, 110 S.Ct. at 706. Assuming for purposes of this discussion that the insurance companies' extra-territorial argument is erroneous, we believe that this is such a case, in that the rationale supporting application of the doctrine is not present here. Therefore, we hold that the act of state doctrine does not bar inquiry into the validity of the Port Captain's order.

■ As we have stated, the party invoking the act of state doctrine has the burden to prove its applicability. *Environmental Tectonics Circuit Op.,* 847 F.2d at 1058 ("The party moving for the doctrine's application has the burden of proving that dismissal is an appropriate response to the circumstances presented in the case."); *see also Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694, 96 S.Ct. 1854, 1861, 48 L.Ed.2d 301 (1976); *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 713 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993); *Williams v. Curtiss–Wright Corp.,* 694 F.2d 300, 303 n. 4 (3d Cir.1982). "At a minimum, this burden requires that a party offer some evidence that the [foreign] government acted in its sovereign capacity and some indication of the depth and nature of the government's interest." *Liu v. Republic of China,* 892 F.2d 1419, 1432 (9th Cir.1989), *cert. dismissed,* 497 U.S. 1058, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990), *quoted in Siderman,* 965 F.2d at 713. Furthermore, cognizant of the rationale supporting the doctrine, a court also must analyze on a case-by-case fashion "the extent to which in the context of a particular dispute separation of powers concerns are implicated." *Allied Bank Int'l,* 757 F.2d at 521. In other words, the court must determine whether there is evidence of a potential institutional conflict between the judicial and political branches such that a judicial inquiry

into the validity of a foreign state's actions could embarrass the political branches in their conduct of foreign affairs. *See Environmental Tectonics Circuit Op.,* 847 F.2d at 1058. This analysis "must always be tempered by common sense." *Allied Bank Int'l,* 757 F.2d at 521 (citations omitted). " 'The less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.' " *Id.* (quoting *Sabbatino,* 376 U.S. at 428, 84 S.Ct. at 940).

The insurance companies maintain that Protexa has not met its burden to demonstrate that the act of state doctrine applies here. They contend that Protexa has not proven that the Port Captain's order even constitutes a Mexican act of state, nor that any government potentially involved in the incident is concerned about having the validity of the order adjudicated in the federal courts.[16] The insurance companies point out that the Mexican government, through its Merchant Marine ("Marine Mercante"), is well aware of this litigation for it permitted the Port Captain to come to the United States to testify in the case. Thus, the companies argue that the Mexican government is not concerned with having the validity of the order adjudicated here. Protexa contends, however, that the Port Captain's order implicated Mexican national interests concerning the safety of its citizens and its oil exploration in the EEZ. As evidence that the incident attracted the attention of the Mexican government, Protexa submits in its reply brief a written opinion of the Port Captain's superiors, the Marine Mercante, affirming the authority of the Port Captain to issue the order.[17]

Although the depth and nature of Mexico's interest in this matter are debatable, we will assume without deciding that it has a substantial interest in this case.[18] Nevertheless,

16. In addition to Mexico and the United States, Panama might have taken an interest in the case, as the HUICHOL was registered there.

17. Prior to oral argument, we denied the insurance companies' motion to strike material concerning the opinion of the Marine Mercante from Protexa's reply brief and supplemental appendix.

18. Thus, we also decline to address whether the issuance of a removal order by the Mexican Port Captain "can be, in certain circumstances, a sufficiently formal expression of a government's public interests to trigger application of the doctrine." *Environmental Tectonics Circuit Op.,* 847 F.2d at 1058. *See Remington Rand Corp. v. Business Systems, Inc.,* 830 F.2d 1260, 1265 (3d Cir.

Protexa has not demonstrated—nor do we find—that this controversy implicates separation of powers concerns of the sort necessary to support invocation of the doctrine. This litigation is between private parties for the sole purpose of resolving an insurance coverage dispute which, in turn, depends upon the construction and application of a single phrase in the policy. We see no reason for believing that a judicial inquiry into the validity of the Port Captain's order under Mexican law, in order to determine whether Protexa may recover wreck removal costs, would hinder the conduct of foreign relations by the United States government. In any event, Protexa has not offered evidence suggesting that our rejection of the act of state doctrine would have that consequence, nor even a basis for believing that diplomatic difficulties could arise in the aftermath of this case.[19]

We also point out that Protexa's contention that an issue of Mexican policy is at stake as we are making a determination of the scope of its powers within the EEZ is simply wrong. As will become clear from the section of our opinion dealing with the validity of the order, we are placing no limitations on the scope of Mexican authority in the EEZ. Rather, we only are determining that the Mexican Congress itself did not establish a legal predicate for the order. Thus, instead of attempting to circumvent Mexican law, we honor that law and apply it.

Essentially, Protexa's invocation of the act of state doctrine would require this court to engage in mere conjecture about the effect that inquiry into the validity of the order might have on relations between the United States and Mexico. However, we stated in *Environmental Tectonics* that invocation of the doctrine requires proof of "a demonstrable, not a speculative, threat to the conduct of foreign relations by the political branches of the United States government." 847 F.2d at 1061. Because we believe that no such threat has been demonstrated, and we will not engage in speculation on this question, we hold that the act of state doctrine is inapplicable here. Hence, we have no need to reach the insurance companies' argument that the issuance of the order was an extraterritorial exercise of jurisdiction, and thereby outside of the doctrine's scope.[20]

Furthermore, we believe that the district court was correct when it pointed out that application of the act of state doctrine in this case differs materially from the manner in which it typically is interposed, *viz.*, by defendants as a "shield." Were we to apply the doctrine to bar judicial inquiry into the validity of the removal order, Protexa automatically would obtain coverage under the insurance policy. Thus, the doctrine would be utilized as a "sword" to prevent the insurance companies from challenging the coverage.

There is another factor which works against applying the act of state doctrine. As we have explained above, Protexa chose to bring this action in the United States. While it contends that it had perfectly legitimate reasons for doing so, and we have no

1987); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1294 (3d Cir.1979).

**19.** Protexa at most asserts that a consequence of holding the Port Captain's order invalid would be that future recipients of similar removal orders would challenge them, thereby exciting Mexico's interest. Yet such a possibility still does not imply that the conduct of foreign relations by the United States government would be hindered as a result.

Moreover, additional challenges to removal orders would seem to raise no such threat, since it is perhaps exactly what should have happened in the present case and should so occur in the future. It appears that Protexa could have challenged the order under the Mexican law of "amparo," the judicial proceeding by which Mexican citizens seek relief from governmental orders. In fact, Protexa's main legal expert witness at trial was Dr. Ignacio Melo, a noted lawyer and expert in Mexican maritime and amparo law, who has been drafting amparos for 37 years and has handled 25–30 wreck removal order cases, with 10–15 in the last six years. Protexa Br. at 27–29. Such qualifications alone indicate that challenging such orders is not unusual.

**20.** To decide this question would seem to decide the very validity of the Port Captain's order, since the Port Captain's authority and jurisdiction are relevant to the order's validity. As such, we do not feel it necessary or wise to consider the implications of a situation in which a court, in order to determine whether the act of state doctrine should be invoked, necessarily must perform the inquiry that the doctrine would prevent.

reason to question its good faith, the fact is inescapable that it is seeking to obtain an outcome determinative advantage from its forum selection. We reach this conclusion for, as our analysis in the next section demonstrates, the Port Captain's order was invalid under Mexican law. Yet Protexa seeks through its forum selection to activate the act of state doctrine and preclude inquiry into the validity of that order. If we apply the act of state doctrine, we will encourage plaintiffs seeking to establish rights under invalid foreign orders and governmental actions to come to this country to bring their cases.

We need not create a "fairness exception" to the doctrine, nor focus solely on the insurance companies, however, to recognize that in the circumstances of this case application of the doctrine would disturb the legal regime underlying the insurance contract. After all, the parties contracted for coverage only if the removal was compulsory by law, meaning in response to a valid order.[21] Indeed, Protexa acknowledges that prior to the issuance of the policy involved in this case it "had always purchased broad form wreck removal coverage" which provided coverage "whenever removal is deemed necessary by the insured." Protexa brief at 5. It further acknowledges that it sought that coverage in the policy involved in this case but could not obtain it, as the insurance companies offered the narrower "compulsory by law" coverage on a "take or leave it" basis. Thus, in this case Protexa was well aware of the limitations of its coverage, and if we permit it to invoke the act of state doctrine to preclude an inquiry into the validity of the order, we will be expanding its coverage beyond what it purchased and paid for.

As we noted in *Protexa Appeal I*, it is significant that Protexa and the insurance companies knew of the case law construing the words "compulsory by law." Therefore, they were presumed to have intended these words to have their proper legal meaning and effect. 954 F.2d at 135–36. Thus, the parties to the insurance policy bargained for the possibility that a court might inquire into the validity of a governmental removal order to determine whether a policy covered a particular wreck removal.

## V. VALIDITY OF THE ORDER

In *Protexa Appeal I* we held that the removal of the wreck was "compulsory by law" if directed by a valid order of the Port Captain. 954 F.2d at 141. Inasmuch as we have determined that the act of state doctrine does not apply and the removal was not compulsory by law under the objective balancing test, we must decide whether the removal order was valid. In this section of our opinion we cite to various provisions of Mexican and international law which we have reprinted in English in the appendix to this opinion.[22]

■ Under Fed.R.Civ.P. 44.1, the determination of foreign law in the federal courts is a question of law to be resolved by reference to any relevant information, including that provided by expert witnesses. *Merck & Co.,* 774 F.2d at 488. Consequently, we exercise plenary review on this question, and are not confined to information available to or considered by the district court.[23]

---

21. Of course, the removal also could be compulsory by law under either of the other two factors we recognized in *Protexa Appeal I,* but we are not concerned with them in this aspect of our opinion.

22. We have copies of Mexican documents translated into English in somewhat different versions. We are satisfied, however, that the differences in the translations are not material to the issues here. Insofar as they are available, we have used the versions used by the district court in *Protexa II.*

23. *See Mobile Marine Sales, Lt'd v. M/V Prodromos,* 776 F.2d 85, 89 (3d Cir.1985). The insurance companies urge us, however, to give at least some deference to the district court's determination of foreign law, on the grounds that this case fits a scenario in which scholarly commentary has noted that deference is justified:

A more restrictive review of foreign-law determinations than is usually accorded domestic law seems justifiable only when the oral testimony on alien law offered at trial is in conflict and the circumstances justify according special weight to the district judge's ability to evaluate credibility and demeanor.

Arthur R. Miller, *Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die–Hard Doctrine,* 65 Mich. L.Rev. 613, 689–90 (citing *Remington Rand, Inc. v. Societe Internationale,* 188 F.2d 1011

We will begin, therefore, by reviewing certain facts relevant to determining the validity of the removal order. Prior to the HUICHOL's sinking in bad weather, it had been granted permission by the Port Captain of the Port of Carmen to anchor in an otherwise prohibited area within the Pemex oil exploratory zone. Anchorage is prohibited in this area because oil platforms and submerged oil pipelines are located in it. The HUICHOL sank approximately 45 miles from the Port of Carmen [24]—beyond the 12–mile limit which denotes Mexico's territorial sea. *Protexa II* at 14–15. Its wreck lay in waters that under UNCLOS comprise the Exclusive Economic Zone, an area of international waters, beyond and adjacent to the territorial sea, in which the coastal state—here Mexico—may exercise sovereign rights to explore, exploit, conserve and manage the natural resources. [25]

A port captain has limited jurisdiction over the EEZ and may perform police functions within this jurisdiction pertaining to health, sanitation and customs. *Id.* at 15, 49. But the Port Captain acknowledged in his testimony that there is a difference between the geographic supervision and the subject matter jurisdiction of his office. Although his jurisdiction exists by virtue of presidential decree, his authority and control within the EEZ are defined by law. *Id.* at 17. The Port Captain testified that he issued the removal order for several reasons, the principal one being that the wreck was located in a high safety zone from which, in his view, all wrecks must be removed. Moreover, he believed removal was required because the Mexican Attorney General had commenced

his investigation, and a visual and physical inspection of the ship would facilitate this process. The Port Captain also believed that the location of the wreck was in an area that affected the Port of Carmen. Finally, due to the loss of life, there was tremendous pressure to recover the bodies of the crew immediately, and the Port Captain believed it important politically to commence removal without delay. *Id.* at 15–16.

Although the Port Captain testified as to his concern for safety and his opinion that the HUICHOL constituted an obstacle to maintenance activity in the oil field, he issued the order without procuring a technical analysis regarding potential movement of the wreck, its threat to oil pipelines and structures, and its potential environmental impact. *Id.* at 16. The district court also noted that even though oil companies normally prepare and maintain charts indicating the location of oil pipelines, there was no testimony that the Port Captain had sought access to such charts. *Id.* at 16 n. 6. Furthermore, Pemex did not exert any pressure for wreck removal; rather, the Port Captain attempted to pressure Pemex to enlist its cooperation. *Id.* at 16. Finally, the wreck lay more than 500 meters from any oil platform, and Protexa never told the captain before he issued the order that the wreck was rapidly sinking in the mud. *Id.* at 16–17.

The district court considered the validity of the order under Mexican statutory and constitutional law, for it believed that a due process inquiry under the Mexican Constitution was relevant to its final validity determination. [26] Ultimately, the district court held

(D.C.Cir.), *cert. denied,* 342 U.S. 832, 72 S.Ct. 44, 96 L.Ed. 630 (1951)). Although the district court was presented with conflicting expert testimony and did have the opportunity to evaluate credibility and demeanor, we believe that the insurance companies have not demonstrated sufficiently that deference is appropriate here. First, a footnote to the quotation above indicates:

> The value of demeanor evaluation in the case of expert testimony on foreign law should not be overemphasized, however. It seems unlikely that the physical appearance and emotional state of a foreign-law expert will be sufficiently distinctive to provide insights into his competence that are not available from the record of his testimony.

*Id.* at 690 n. 295. Second, the insurance companies point to no special circumstances—other

than the conflicting testimony—that would warrant a deferential approach, and they have cited no precedent in support of their position. Because we are convinced that the record is sufficient to enable us to evaluate the competing testimony in an informed manner, we choose not to depart from our normal standard of plenary review.

**24.** The Port of Carmen supports offshore oil exploration and exploitation. *Protexa II* at 39.

**25.** We have included relevant UNCLOS provisions in the appendix.

**26.** Article 16 of the Mexican Constitution provides that "no one may be bothered in his per-

that the Port Captain's order requiring Protexa to raise a wreck outside Mexico's territorial waters was invalid because: (1) it was not authorized by Mexican statutory law; and (2) under Article 16 of the Mexican Constitution, the government cannot order a private party to raise a wreck at its own expense absent statutory authority. Finally, even though the removal order did not cite to principles of the international law of the sea for authority, and the district court believed that UNCLOS was not incorporated into Mexican law prior to the issuance of the order, the court nevertheless examined the relevant provisions of UNCLOS and found them to provide an insufficient basis for the order.

In reaching its conclusions, the district court considered testimony regarding the validity of the order under Mexican and international law from witnesses produced by both sides, and we consider such testimony integral to our present decision.[27] We therefore examine the statutes cited by the Port Captain in the order as authority for requiring Protexa to raise the wreck: Article 86 of the Law of Navigation and Maritime Commerce (Navigation Law), and Articles 262 and 263 of the Law of General Means of Communication (Means of Communication Law). Because the expert witnesses differed over the meaning of these statutes, the district court made reference to other portions

of the statutes and we will consider them as well.

### A. *Article 86 of the Navigation Law*

The Port Captain first cited Article 86 of the Navigation Law, enacted in 1963. The article is a wreck removal provision which states in part:

> If a ship runs aground or sinks in a port, in an area considered as such in terms of the last paragraph of Article 33, or in a general waterway of communication, in a manner that constitutes a navigational obstacle or that affects navigation, it shall be removed within the period set forth by the Navy Department.

Clearly there are two requirements for Article 86 to be applicable. First, the ship must sink in a specific location, namely, a port, an area considered to be a port under Article 33 of the Navigation Law, or in a "general waterway of communication." Second, the sunken ship must constitute an obstacle to navigation or affect navigation.

Although Protexa's expert on maritime law, Dr. Ignacio Melo, and the insurance companies' expert on maritime law, Ambassador Alberto Szekely, agreed that the HUICHOL sank outside of Mexico's territorial waters and in the EEZ, they disagreed on whether Article 86 granted the Port Captain the authority to order wreck removal at the expense of a private citizen where the HUI-

---

son, family, domicile, papers or possessions, except by means of written order issued by a competent authority providing the basis and the reasons of the legal cause for the proceedings." Regarding the due process inquiry the district court stated:

> Overarching the validity of the Port Captain's order is whether the Port Captain, as a representative of the Mexican government, possesses the authority to order a private citizen to raise and remove a wreck beyond Mexico's territorial sea without specific statutory authority enabling him to do so. Because Protexa was a private citizen when its vessel, the Huichol II (Huichol), sank and the sinking occurred outside of Mexico's territorial waters, this inquiry is especially appropriate. Given that the Republic of Mexico models its Constitution after that of the United States, the due process inquiry is as relevant under the Mexican Constitution as it would be under the United States Constitution.
>
> The answer to the inquiry centers on the interplay between Mexico's exercise of its sov-

ereign power in relation to that of its citizens. If the sovereign's exercise of power is unbridled or authorized by law, then the Port Captain's order is valid. If the Port Captain's order is in fact unauthorized by law or is proscribed in the constitutional sense, then the order is invalid.

*Protexa II* at 5–6 (footnote omitted).

27. These witnesses were Miguel Angel Rebolledo, the Port Captain who issued the order; Dr. Ignacio Melo, an expert in Mexican maritime law; Bernard Oxman, an expert in international law and the United Nations Convention on the Law of the Sea ("UNCLOS"); Ambassador Alberto Szekely, an expert in Mexican law of the Sea and UNCLOS; Francisco Alva Rosas, an acting port captain; and David Pockett, an expert in wreck removal and salvage operations. Depositions of Pockett and Robert Umbdenstock, the on-site salvage master who assisted Protexa with the removal operation, also were read into the record.

CHOL sank. While they agreed that the HUICHOL did not sink in a port or in an area considered as such under Article 33, they disagreed as to whether the waters of the EEZ were waters of general means of communication.[28] The district court credited Ambassador Szekely's testimony that the EEZ was not a general waterway of communication within the meaning of Article 86. *Protexa II* at 43-45. The Ambassador pointed out that the phrase "general waterway of communication" is defined in Article 1 of the Means of Communication Law. Section I of that article refers to Mexico's territorial waters, and the three remaining sections refer to several types of federal waters capable of sustaining international commerce or commerce among the Mexican states. However, the article does not mention the EEZ.

Protexa's expert, Dr. Melo, testified that the EEZ could be considered a "general waterway of communication" because Article 9 of the Navigation Law, passed in 1963, derogated the definition of "general waterway of communication" contained in Article 1 of the Means of Communication Law, passed in 1940. Article 9 states in part: "The general means of communication by water are the territorial seas and the *other waters of federal jurisdiction,* when they can be used for navigation." (emphasis added). On Dr. Melo's theory, use of the phrase "other waters of federal jurisdiction" in Article 9 was a statutory anticipation of Mexico's creation of the EEZ.

Ambassador Szekely, however, contended that Article 9 of the Navigation Law did not supersede Article 1 of the Means of Communication Law. Rather, he stated, the phrase "other waters of federal jurisdiction" in Article 9 of the Navigation Law was merely a shorthand expression for the waters enumerated in sections II–IV of Article 1 of the Means of Communication Law, as those delineated waters were all waters of federal jurisdiction as distinguished from the territorial waters of the first section. Thus, the

entire sentence in Article 9 references all of Article 1. Moreover, Ambassador Szekely showed that Article 1 of the Means of Communication Law could not have been abrogated by Article 9 of the Navigation Law because Article 6 of the Navigation Law expressly mandates reference to the Means of Communication Law when questions arise regarding the interpretation of general ways of communication by water. Finally, the Ambassador also challenged Dr. Melo's view that Article 9 of the Navigation Law anticipated the concept of the EEZ in 1963, as he showed that the physical contours of the EEZ were not formed until 1971 and Mexico established its 200–mile zone in 1976 and ratified UNCLOS in 1982. Thus, in Ambassador Szekely's opinion, the EEZ is not included in the definition of a "general waterway of communication," and under Article 1 of the Means of Communication Law, the outer limit of the general way of communication of water is the 12–mile limit of the territorial sea which is the property of Mexico. Accordingly, Ambassador Szekely reasoned that because the HUICHOL sank in the EEZ, an area beyond the territorial sea and not the property of Mexico, it did not sink in a "general waterway of communication."

The district court found "Ambassador Szekely's knowledge of the statute's language and his grasp of the legislative history ... compelling." *Protexa II* at 45. Consistent with the Ambassador's testimony, the district court held that "Article 86 is territorially based, limited to the property of Mexico, bounded by a twelve-mile border and limited to a port or in an area considered as such," and "its application is restricted to an obstacle to navigation or one which affects it." *Id.* Inasmuch as the HUICHOL sank outside of Mexico's territorial waters and did not affect navigation, the district court held that Article 86 of the Navigation Law could not supply a legal basis for the Port Captain's order.[29]

---

28. Article 33 refers to places not yet declared as ports or still under construction and located within the coastline.

29. The court also noted that the testimony of the acting port captain, Francisco Alva Rosas, was consistent with that of Ambassador Szekely. Rosas, the acting port captain, should not be confused with Rebolledo, the Port Captain who issued the order. *See* footnote 27, *supra.*

We agree with the district court's conclusion. On appeal, Protexa raises essentially the same arguments it advanced in the district court, contending that the EEZ is included as a "general waterway of communication," even if the concept was not formed fully in 1963, because "the plain wording of the statute conclusively evidences the contemplation by the Mexican legislature of some maritime zone of federal jurisdiction distinct from territorial waters as early as 1963—and it intended Article 86 to have effect in those waters wherever they may be." Protexa Br. at 32. To bolster this claim, Protexa provides a history of the development of the EEZ concept and its enactment into Mexican law, and expressly points out that the Mexican Federal Law of the Sea, which incorporates UNCLOS into Mexican law and became effective in 1986, states in its preamble that it "has federal jurisdiction," and it governs the EEZ among other maritime zones.[30]

Yet, it remains the case that in 1963, when Articles 86 and 9 of the Navigation Law were enacted, the EEZ concept was at best in a period of gestation, and there were no contemplated waters of federal jurisdiction other than those described in Article 1 of the 1940 Means of Communication Law, which provided the definition of "general waterway of communication," and to which explicit reference is made by Article 6 of the Navigation Law. We therefore reject the argument that although the Navigation Law was enacted against the backdrop of the 1940 Means of Communication Law, nevertheless the use of the phrase "other waters of federal jurisdiction" in Article 9 was intended by the Mexican Congress to provide for an ever-expanding definition of the "general means of communication by water."

For several reasons, the fact that the international community later developed the EEZ concept and Mexico asserted jurisdiction over it as provided under UNCLOS does not alter the reasonable interpretation that under Mexican law the EEZ is not a "general waterway of communication" under Article 86. First, as Ambassador Szekely testified, Article 6 of the Navigation Law provides that the definition of "general ways of communication by water" is also consistent with the international treaties ratified by Mexico, and Article 9 of the same law implicitly makes all general ways of communication by water Mexican property. Therefore, to extend the concept of "general ways of communication" to include the EEZ would imply Mexican ownership over the EEZ, contrary to international law and to Mexico's treaty obligations, as Mexico does not and could not own the EEZ.

Protexa responds to this interpretation by arguing that the statutes cited in the removal order are not limited to the territory of Mexico, and even if they were, the removal order still would be valid under principles of international law. Protexa Br. at 46–47. Yet, here we are addressing merely the question of whether the EEZ can be included under the definition of "general ways of communication" as argued by Dr. Melo and not the broader question of whether the order is consistent with international law. We believe that the use of the phrase "other waters of federal jurisdiction" in Article 9, as passed in 1963, did not contemplate the later development of the EEZ, and Protexa has provided no grounds for believing that non-territorial "general ways of communication" were so contemplated. Consequently, we credit Ambassador Szekely's testimony as to the territorial constraints of Article 86 even if, for the purposes of this discussion only, Protexa is correct that the removal order could be considered valid under principles of international law.

Finally, although Protexa cites the language of the 1986 Federal Law of the Sea, it offers no satisfactory response to the fact that this law was enacted after the HUICHOL sank and that the law states not that the waters of the EEZ are "waters of federal jurisdiction," but rather that the "Law has

---

**30.** Protexa Br. at 32–37. Article 2 of the Federal Law of the Sea states:

This Law has federal jurisdiction; it governs the maritime zones that are part of the national territory and, as applicable, the maritime zones beyond said territory over which the nation exercises sovereign rights, jurisdiction and other rights.

25 Int'l Legal Materials 889 (1986); Protexa App. at 515.

federal jurisdiction." Nor does Protexa offer any rationale upon which to discredit Ambassador Szekely's testimony that the 1986 law was not intended to alter the definition of "general ways of communication" contained in Article 1 of the Means of Communication Law. AAMS App. at 123–24. As Ambassador Szekely drafted the 1986 law (AAMS App. at 60–61), we choose also to credit his testimony to this effect. Thus, like the district court, we are of the opinion that Article 86 could not have provided a legal basis for the Port Captain's removal order.[31]

### B. *Article 262 of the Means of Communication Law*

Article 262 of the Means of Communication Law, enacted in 1941, is the second statutory provision cited in the removal order. On its face, the article does not address wreck removal, but rather authorizes investigations into maritime casualties and provides for the appointment of two experts per investigation to accomplish this objective. The district court concluded that the article is not port-centered and conceivably could extend to a vessel located in the EEZ, as the Port Captain may perform police functions within his jurisdiction as they pertain to health, sanitation and customs. Furthermore, he serves as auxiliary to the public prosecutor. *Protexa II* at 49. However, although Article 262 permits the Port Captain to commence an investigation and appoint investigators, it does not address the question of whether the government may order a private citizen to pay for removal of a wreck to assist with this investigation, or whether the government must shoulder the removal expense itself.

Dr. Melo testified that Article 262 is sufficient legal basis in itself for a removal order if removal is reasonably necessary to complete the investigation. Protexa App. at 297, 306–10. However, the district court again credited the testimony of Ambassador Szekely, who stated that the 1986 Federal Law of the Sea governing Mexico's maritime areas is silent as to wreck removal and does not authorize wreck removal jurisdiction in the EEZ. *Protexa II* at 49–50. Consequently, the Ambassador concluded—and thus the district court held—that without such legal authority the government must pay for wreck removal incident to the investigation, for it otherwise would violate Article 16 of the Mexican Constitution, which requires a statutory basis for a government order against an individual. *Id.* at 50–51.

We agree with the district court's conclusion, as Protexa merely contends that we should give Dr. Melo's view greater weight due to his substantial experience with the law here. Our reading of Article 262 convinces us that the article simply cannot be understood to have the broad implications Dr. Melo attributed to it. Indeed, if it did, it would be difficult to limit the scope of the section, for all sorts of things could be justified as being in aid of an investigation. For example, Article 262 could justify the holding of witnesses incommunicado or the seizure of private property without legal process or redress. We cannot believe that the Mexican Congress could have contemplated such procedures.

### C. *Article 263 of the Means of Communication Law*

Article 263 of the Means of Communication Law, enacted in 1941, is the remaining statutory provision cited in the removal order. Like Article 86 of the Navigation Law, Article 263 is a wreck removal statute, but it is not dependent on the wreck being a hazard to navigation. Rather, Article 263 compels the owner of a wreck to remove the vessel if it sinks within a port, or in the vicinity/proximity of a port provided it affects the port. But inasmuch as Protexa does not contend the HUICHOL sank within a port, we are concerned only with whether it sank within the vicinity/proximity of a port and affected the port.

Ambassador Szekely testified that the more restrictive word "vicinity" is the more

---

**31.** Protexa also argues that the district court did not consider the second component of the test for the applicability of Article 86, namely the navigational obstacle prong, other than in a "conclusory statement" that this element of the test had not been met. Protexa Br. at 37–39. We have no need to address this argument because we have found that the first element of the test has not been met.

appropriate interpretation. Thus, the phrase "affects the port" reflects a legislative determination that it is necessary to protect the interests of navigation within the port and navigation to and from the port. *Protexa II* at 46. The Ambassador focused on Article 33 of the Administrative General Regulations for the Police of Ports (the "Port Regulations"), promulgated in 1941, to support his view. Article 33 compels removal of a wreck which sinks within a port or which interrupts navigation. However, Dr. Melo interpreted the phrase "affects the port" in an economic sense, testifying that the law must be interpreted in light of the connection between the oil fields and the two ports servicing them. Protexa App. at 291–95. Consequently, Protexa argues that Article 263 is not limited to protecting navigational interests, but rather that it applies here because the sinking of the HUICHOL in the oil fields directly affected the commerce of the ports involved. Protexa Br. at 41.

The district court accepted Ambassador Szekely's view, adopting the navigational interest interpretation of the article and the more restrictive translation of "vicinity." *Protexa II* at 47. Since the HUICHOL did not sink within a port or in the vicinity of a port, but rather 45 miles from the coast, its location could not interrupt navigation to and from the port. Consequently, the district court held that the Port Captain's order was not authorized by Article 263. *Protexa II* at

47. Protexa rejects this interpretation and argues that Article 33 should not be read to restrict the open-ended language of Article 236, and that "common sense" dictates that the legislature contemplated wrecks affecting the port in more ways than merely obstructing navigation in and to the port. Protexa Br. at 40–41.

We adopt the holding of the district court, however, as Protexa's reading of the article to comprise wrecks which affect the port in an economic sense surely is more strained and artificial than Ambassador Szekely's interpretation. In taking this position, we view Article 33 of the Port Regulations as illuminating the kinds of concerns behind Article 263. Moreover, we cannot believe that when the Mexican Congress passed Article 263 in 1940, it envisioned that it would be applied as Protexa would have us today, *viz.*, to a wreck located some 45 miles off the coast in international waters. Indeed, we think that under Dr. Melo's interpretation, an order could be issued under Article 263 for removal of a wreck hundreds of miles from Mexico if such a wreck could affect a Mexican port in an economic sense.

Thus, our analysis of the Mexican statutes cited in the Port Captain's order as authority for requiring Protexa to raise the wreck leads us to conclude that the district court was correct in holding the order invalid under Mexican law.[32] As the order was not a

---

32. Although Protexa argued in the district court and argues on appeal that the removal order was valid under principles of international law without reference to the domestic legislation cited by Mexico to justify its actions, we will not predicate a decision regarding the validity of the order on the basis of legal authority not invoked by the Port Captain to justify his order. In fact, on the basis of the record, it also appears that when the Marine Mercante issued its own opinion affirming the Port Captain's order, it too did not seek to justify the actions taken on the basis of separate principles of international law. *See* Protexa Reply Br. at 10–11.

While the district court held on remand that even if UNCLOS had been cited it would not have justified the order, we decline to consider whether the order was consistent with the provisions of the international law of the sea as enacted into Mexican law. Given the quite fluid and complex circumstances surrounding the sinking of the HUICHOL and the issuance of the removal order, we believe that as concerns the validity of

the order, and therefore the "compulsory by law" question, all of the parties involved—Protexa and the insurance companies—should be entitled to rely upon the legal authority cited in the order in making their determinations. The Mexican authorities chose not to ground their actions on principles of international law. Protexa, a private corporation and thus not an entity of the Mexican government, should not now be heard to argue that their removal of the HUICHOL was "compulsory by law" based upon authority not cited in the order nor considered at the time. When a removal order has been issued and its authority cited, determining whether legal compulsion exists should not require speculation as to other possible unstated grounds. We also point out that the circumstance that actions are justified under international law does not mean that as a matter of domestic law they are valid. For example, we do not doubt that as a matter of international law officials of the Immigration and Naturalization Service could enforce exclusionary policies against aliens not autho-

valid order, Protexa's removal of the HUICHOL was not "compulsory by law" under the terms of the insurance contract between it and the insurance companies. Consequently, *Protexa is not entitled to recover the expenses of raising the wreck from the insurance companies.*

## VI. CONCLUSION

Based upon the aforesaid analysis, we will affirm the judgment entered on May 14, 1993, in favor of the insurance companies.

*Documentary Appendix*

A. *The Port Captain's Order*

SUBSECRETARIAT OF OPERATION
DIRECTORATE GENERAL OF
  MERCHANT MARINE.
OFFICE OF THE CAPTAIN OF
  THE PORT
SECTION OF MARINE SHIPS
OFFICIAL COMMUNICATIONS
  CP–3312–23–3350
  File.1
OFFICE OF THE
CAPTAIN OF THE PORT
CALLE 20 No.29
P.O. Box 24100

RE: This is a communication concerning salvage of the vessel 'HUICHOL' of your Company

  Cuidad del Carmen,
  State of Campeche
  December 17, 1985

TO:

CAPTAIN CARLOS H. MERINO GARCIA DE ALBA

CHIEF OF MARINE OPERATIONS OF THE COMPANY

"CONDUX," S.A. DE C.V.

AV. PERIFERICO 8 North

C I T Y.—

This Maritime Authority is pleased to resolve after analysis of the procedures conducted by it in connection with the sinking of National Motor Vessel ("Buque Motor de Posicionamiento Dinamico Nacional") named "HUICHOL" having the following characteristics: 499.83 gross tons, 151.57 net tonnage, registered in this Port under number 2623 and owned by your Company, (to) refer the following procedures to Higher Authority (in order) to request Expert Opinions from technical personal and reports as to the causes that occasioned the sinking of said Vessel at the following coordinates marked by radar: Latitude 19 degrees and Longitude 91 degrees 58.5' W., and therefore, based on the Sole Article published in the Official ("Diario Oficial") of the Federal Government dated March 28 of this year and on Articles numbers 86 of the Law of Navigation and Maritime Commerce ("Ley de Navigation y Comercio Maritimo") and 262 and 263 of the Law of General Means of Communication ("Ley de Vias Generales de Comunicacion"), requests that such Company "CONDUX" S.A. de C.V., deposit the sum of Pesos $10,000,-000.00 (Ten Million Pesos and 00/100, Mexican Currency) to guarantee the cleaning up of the area and the salvaging of said Vessel, in addition to guaranteeing any damage or loss that may arise in the course of the salvage operations, hereby stating by way of clarification that such sum may be furnished by a Bond or Deposit or Guaranty ("Billete de Deposito") furnished by an Insurance Company to the name of the Treasury of the Federal Government and for availability to the General Directorate of the Merchant Marine, a term of 25 days from the date of notification of this resolution hereby being granted as provided in the above cited Article 86.

  Respectfully,
  The Captain of the Port,
  s.)
  CAP.ALT. I.G. MIGUEL A. REBOLLEDO
    GUIOT

rized by American law. Nevertheless, in a deportation case we look to domestic law to determine whether a deportation order is lawful. While we recognize that there may be some situations in which international law in itself may justify governmental actions, perhaps the suppression of piracy, we surely are not confronted with such a case here.

(Seal of the United Mexican States)

(Seal of the Directorate General of Merchant Marine

Office of the Captain of the Port

Cuidad del Carmen, State of Campeche)

Copies: To the DIRECTOR GENERAL OF MERCHANT MARINE.—

For the information of Higher Authority.—

Respectfully.—

Jose Maria Ibarran No. 47.—

03900 Mexico. D.F.

B. *The Law of Navigation and Maritime Commerce (1963)*

*Article 86*

If a ship runs aground or sinks in a port, in an area considered as such in terms of the last paragraph of Article 33, or in a general waterway of communication, in a manner that constitutes a navigational obstacle or that affects navigation, it shall be removed within the period set forth by the Navy Department, by the owner, the ship owner, or by anyone with a legal interest in the ship; all of whom are severally liable for the fulfillment of this obligation. If the ship is not removed within the established period, the Department will make a cost evaluation which will serve as the basis to make, the claim of the corresponding rescue cost pursuant to the administrative execution proceedings established in the Federal Tax Code, and the Navy Department shall proceed by itself, or with the intervention of a third party, to carry out the necessary works to effect the removal.

*Article 6*

Questions which may arise over the interpretation of ... what pertains to general means of communication by water ... shall be decided by the provision of: a) This Law and other laws on communications by water and their regulations; as well as by the international treaties duly ratified by Mexico; 6) The Law on General Means of Communication....

*Article 9*

For the purposes of this law:

I. The following are goods of maritime domain and national property:

a) The territorial sea and the inshore marine waters;

b) The continental shelf, the submarine tunnels of the islands, islets and reefs adjacent to the ports, lakes, lagoons or estuaries communicating with the sea, in the terms set forth in the Political Constitution for the Mexican United States and in the international treaties duly ratified by Mexico;

c) The canals communicating the marine spaces;

d) The navigable rivers ...

e) The seashores ...

f) The portion of the sea and inshore zone being a part of the port premises;

g) The ports, bays, roads and inlets;

h) The docks, decks ...

i) The resources and proceeds of the goods listed in the foregoing subparagraphs; and

j) The constructions and installations made by private companies or individuals in goods of the maritime domain, when reversed [33] in favor of the Nation.

II. The following goods shall be subject to the regime of the goods of the maritime domain, when they are part of the port premises or the services to which this law refers are affected:

a) The navigable canals, when related to inshore waters;

b) The navigable lakes and lagoons;

c) The sea and inshore zone;

d) The banks and federal zones adjacent to the river beds ...

e) The pieces of land recovered from the sea or from the estuaries.

III. The general means of communication by water are the territorial seas and the *other waters of federal jurisdiction,* when they can be used for navigation. They include the works and installations which constitute the maritime or fluvial terminals

---

**33.** In a version of this article in a supplement to Protexa's brief, the word "reversed" appears in the text. We think that "reserved" may be the correct word.

and the areas necessary for providing port and maritime services.

IV. The areas subject to the regime applicable to the goods of maritime domain and devoted to the establishment of the facilities and to the rendering of the services to which this law refers, shall be considered as port premises.

(Emphasis supplied).

*Article 33*

The locations of shorelines and of banks of rivers, lakes and estuaries that have not been declared ports, or that are under construction, will be considered ports for the application of the provisions of this Law with respect to vigilance, police and maritime accidents.

C. *The Law of General Means of Communication (1940)*

*Article 1*

I. The territorial waters, in the extent and terms established by law and by international law;

II. The floatable and navigable rivers as well as the floatable and navigable tributaries, provided they are in any of the following cases:

a) Whenever they terminate in the sea, or in a lake, lagoon, or a stream of the kind referred to in the following section;

b) Whenever they serve totally or partially as a geographic border for the national territory, or between two or more states;

c) Whenever they cross from one state to another;

d) Whenever they cross the border of another country.

III. Floatable or navigable lakes, lagoons, and streams, provided they comply with any of the following requirements:

a) Whenever they communicate permanently or at times with the sea;

b) Whenever they are connected with constant water courses;

c) Whenever they serve totally or partially as a geographic border for the national territory, or between two or more states;

d) Whenever they cross state lines;

e) Whenever they cross the border of another country.

IV. Channels destined or to be destined for navigation whenever they fall into any of the cases described in Sections II and III hereof.

*Article 262*

In the event that of shipwreck, fire, collision, running aground, or of any other accident outside a port which affects the cargo, the crew or any other persons aboard, the captain shall proceed to conduct an investigation recording the events in the navigation diary, or binnacle substituting it, with an obligation to inform the maritime authorities upon arrival to port. If the accident occurs in the port, notice will of course be given to the maritime authorities, which will proceed to conduct the corresponding investigation informing the Communications Department as soon as possible. The latter may, if it is deemed appropriate, appoint two experts who will give an opinion on the cause of the accident and on any parties presumed responsible. Once the investigation is terminated the results thereof shall be turned over to the Federal District Attorney within the term of five days.

*Article 263*

In the event of shipwreck within port, or in the vicinity [vicinity] [proximity] thereof provided it affects the port, the owner or any interested company shall proceed to remove the wreck within the period set forth by the Harbormaster's office; provided, however, that the provisions of Article 47 hereof will apply in the event that there is a refusal to carry out the necessary works.

D. *Administrative General Regulations for the Police of Ports (1941)*

*Article 33*

The Chief of the Police of the Port shall compel the patrons or owners of the vessel sinking within a port (or in places which interrupt navigation), to float them, to re-

move them or to destroy them within a reasonable time limit after which, if the order has not been observed, the Federation shall proceed to its destruction or auction, without such measure exempting the Captain, patron or owner of the vessel from the payment of the expenses incurred, nor from the obstruction fine that maybe imposed on them. . . .

E. *The United Nations Convention on the Law of Sea (UNCLOS)*

*Article 55—Specific Legal Regime of the Exclusive Economic Zone*

The exclusive economic zone is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established in this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention.

*Article 56—Rights, Jurisdiction and Duties of Coastal State in the Exclusive Economic Zone*

1. In the exclusive economic zone, the coastal State has:

   (a) sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or non-living, of the waters superadjacent to the sea-bed and its subsoil . . .

   (b) jurisdiction as provided for in the relevant provisions of this Convention with regard to:

   (i) the establishment and use of artificial islands, installations and structures;

   \*　　\*　　\*　　\*　　\*　　\*

   (iii) the protection and preservation of the marine environment;

   (c) other rights and duties provided for in this Convention.

*Article 60—Artificial Islands, Installations and Structures in the Exclusive Economic Zone*

1. In the exclusive economic zone, the coastal State shall have the exclusive right to construct and to authorize and regulate the construction, operation and use of:

\*　　\*　　\*.　　\*　　\*　　\*

   (b) Installations and structures for the purposes provided for in article 56 and other economic purposes;

   (c) Installations and structures which may interfere with the exercise of the rights of the coastal State in the zone.

2. The coastal State shall have exclusive jurisdiction over such artificial islands, installations and structures, including jurisdiction with regard to customs, fiscal, health, safety and immigration laws and regulations.

3. Due notice must be given of the construction of such artificial islands, installations or structures and permanent means for giving warnings of their presence must be maintained. Any installations or structures which are abandoned or disused shall be removed to ensure safety of navigation, taking into account any generally accepted international standards established in this regard by the competent international organization. . . .

4. The coastal State may, where necessary, establish reasonable safety zones around such artificial islands, installations and structures in which it may take appropriate measures to ensure the safety both of navigation and of the artificial islands, installations and structures.

F. *The Mexican Constitution*

*Article 16*

Article 16 of the Mexican Constitution provides that "no one may be bothered in his person, family, domicile, papers or possessions, except by means of written order issued by a competent authority providing the basis and the reasons of the legal cause for the proceedings."

SUR PETITION FOR REHEARING

April 28, 1994

Before: SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and LEWIS, Circuit Judges, and POLLAK, District Judge\*.

The petition for rehearing filed by the appellants, Grupo Protexa, S.A., and Condux, S.A. de C.V., in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge Becker and Judge Hutchinson would grant rehearing by the court in banc.