[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10343
Non-Argument Calendar

_____

Agency No. A097-943-956

YAROSLAV YURIVICH VIKULIN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(February 17, 2021)

Before JILL PRYOR, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

Yaroslav Vikulin, a Russian national and citizen of Kazakhstan, seeks review of the Board of Immigration Appeals' ("BIA") order affirming the Immigration Judge's ("IJ") denial of his application for asylum, pursuant to 8 U.S.C. § 1158(a); withholding of removal under 8 U.S.C. § 1231(b)(3); and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), *see* 8 C.F.R. § 1208.16(c). He challenges the BIA's determination that he failed to show that he was persecuted on account of a protected ground or that he could not reasonably relocate within Kazakhstan to avoid persecution. He also asserts that he met the standard for withholding of removal and CAT relief and that the BIA violated his due process rights when it failed to consider all of the issues he raised on appeal from the IJ's decision.

Additionally, Vikulin seeks review of the BIA's subsequent order denying his application for adjustment of status and his motion for remand based on new evidence. He argues that the BIA erred in its discretionary decision to deny him an adjustment of status by failing to use certain positive factors to offset negative factors, and the BIA abused its discretion when it denied his motion to remand. Because we conclude that we lack jurisdiction over some of Vikulin's claims and he is not entitled to relief on the merits of his remaining claims, we dismiss the petition in part and deny it in part.

2

## I.    Background

Vikulin is a Russian national who was born in Kazakhstan in 1981.  He was admitted to the United States in January 2001 on an H-4 visa as a dependent of his mother, who was at that time in the United States on an H-1B visa.  Vikulin was 19 at the time of his admission.  In 2002, he changed his visa status to that of a student and started attending college in Georgia.  In the fall of 2003, he stopped attending classes.  As a result, in September 2004, Vikulin was served with a Notice to Appear, which charged him as being removable for failure to maintain or comply with the conditions of his non-immigrant status, pursuant to 8 U.S.C. § 1227(a)(1)(C)(i).  At a hearing in December 2004, Vikulin conceded his removability and the IJ granted his request for voluntary departure, ordering him to depart by September 20, 2005.  Vikulin failed to depart, and his grant of voluntary departure became a final order of removal to Kazakhstan.

After being arrested for a DUI in 2010, Vikulin successfully moved to reopen his removal proceedings so that he could seek asylum, withholding of removal, and CAT relief.  He appeared again before the IJ in March 2011 and conceded his removability.  The IJ designated Kazakhstan as his country of removal and set a hearing on his application for September 2013.

In his application for asylum, withholding of removal, and CAT relief, Vikulin expressed a fear of persecution in Kazakhstan on account of his Russian

ethnicity.  Specifically, he asserted that Russians are the minority in Kazakhstan, and, after the fall of the Soviet Union, Russians in Kazakhstan "became a target for nationalistic oppression, abuse and discrimination."  He stated that in 1998, his family was blackmailed and targeted for money because people knew his mother was working in the United States.  On one occasion, he was severely beaten by the individuals who were demanding money and suffered a broken jaw, resulting in a week-long hospitalization.  Vikulin stated that he "was attacked many times" while in Kazakhstan.  He averred that he feared for his safety if returned to Kazakhstan and believed he would be "a target for op[p]ression, discrimination and most likely physical reprisal by Kazakh nationals."  He admitted that he had been arrested twice for DUI—once in 2001 and once in 2010.

After many continuances over several years, the immigration court held a merits hearing on Vikulin's application in April 2017.  Vikulin testified that he was afraid to go back to Kazakhstan because, while he was living there "some criminal elements found out that [his] mother [was] working abroad, and of course USA is a source of money, so [he] was blackmailed and they kind of terrorized [him] for money."  When he left Kazakhstan, those people told him they would look for him if he came back.  He also testified that within the last few years, his grandmother, who at the time still lived in Kazakhstan, received a call from some individuals who told her that Vikulin was in jail and that they needed money from her to help

4

him.  He stated that even though this incident was "a prank" and his grandmother did not pay any money and was not harmed, the incident demonstrated that individuals in Kazakhstan still remembered him and were waiting for him to come back.

Vikulin stated that Russians are a minority in Kazakhstan and, since the Soviet Union broke up, they cannot get good educations, jobs, or healthcare in Kazakhstan.  He further asserted that he was targeted "many times" because he was Russian.  When asked to elaborate, he explained that, in 1998, on New Years Eve, Kazakh individuals broke his jaw because he "look[ed] different and [he] had a source of money coming from [his] mom" in the United States, and he refused to pay them.  Although the people who attacked him wore masks, Vikulin stated he knew they were Kazakh nationals because of their accents, and he believed they worked for the police and their job was to extort money from people, particularly Russians.  He confirmed that those individuals harmed him because he refused to pay and that they threatened him and tried to extort money from him "every week pretty much."  If returned to Kazakhstan, Vikulin asserted that he believed these same "criminal elements" would capture him at the airport because they said they were "going to wait for [him]."

Vikulin filed a report with the Kazakhstan police regarding the beating during which he suffered a broken jaw, but stated that "nothing" really happened

after he filed it and that he was contacted by people that said they knew he had filed a report and it would not do him any good. Because he was contacted by these individuals about the police report after he filed it, Vikulin believed these individuals worked for and were protected by the police. The case was closed three months later by the police.

In addition to the broken jaw incident, Vikulin confirmed that he "was beaten up a few times" and this was a "normal" routine in Kazakhstan to make sure people "pay." In fact, between 1998 and 2000, while Vikulin attended a university in Kazakhstan, he would get "thrown between people" and pushed and kicked on an almost weekly basis. He explained that Russians at the Kazakhstan University were targeted by the "criminal elements."

Tatiana Vikulin, Vikulin's mother, testified that she was admitted to the United States in 1998 on a visa and obtained citizenship in 2011. She explained that when the Soviet Union collapsed, the situation in Kazakhstan changed and there was a lot of animus toward Russians. She stated that her husband and other son received anonymous phone calls while in Kazakhstan trying to extort money from them, and that she knew from family that Vikulin was targeted, blackmailed, and beaten by "racketeers" in Kazakhstan who knew she was working in the United States and was a "good source of money." She feared that Vikulin would be harmed if he returned to Kazakhstan because there is "no Russian nationality

left" in Kazakhstan, the country is not stable, and they have no family there. Additionally, in 2010, a former neighbor told Tatiana's mother that people in Kazakhstan were searching for their family and waiting for Vikulin to return.

Yuri Vikulin, Vikulin's father, testified that he came to the United States in 2002 and became a citizen in 2013. Yuri confirmed that he drove Vikulin to the hospital after the beating in which Vikulin suffered a broken jaw. Yuri did not know who had attacked his son, and stated that the police closed the case because they could not find the culprits. He also stated that it was difficult for Russians to be promoted in Kazakhstan and that he was forced to resign a leadership position at an institute there so that it could be given to a Kazakh national instead. Additionally, friends who were still in Kazakhstan told him that Russian owned businesses were targeted for arson. Yuri confirmed that he believed Vikulin "will have problems" if returned to Kazakhstan because of things he had read and heard concerning the current state of affairs in Kazakhstan.

The IJ found Vikulin credible but denied his application for asylum, withholding of removal, and CAT relief, concluding that he had failed to establish his eligibility for such relief. In relevant part, the IJ found that Vikulin had not demonstrated that he suffered past persecution or that he had a well-founded fear of future persecution on account of his race, nationality, or his membership in a particular social group. Rather, the evidence demonstrated that Vikulin was

7

subject to "general criminal activity" and "acts of private violence" and was targeted because of his family's wealth and ability to pay bribes. Thus, the IJ reasoned that Vikulin's race or nationality was not a central reason for his persecution. The IJ further found that Vikulin failed to establish a well-founded fear of persecution because he did not submit any evidence showing that he would be unable to reasonably relocate within Kazakhstan and avoid future persecution. Because Vikulin failed to meet his burden of establishing his eligibility for asylum, the IJ determined he could not satisfy the higher burden for withholding of removal. Lastly, with regard to CAT relief, the IJ determined that Vikulin failed to show that he would more likely than not be tortured by, at the instigation of, or with the consent or acquiescence of, any public official.[1] Vikulin appealed the IJ's decision to the BIA.

While Vikulin's appeal was pending before the BIA, he filed a motion to remand his case to the IJ so that the IJ could consider an application for adjustment

_____

[1] The IJ made other findings when ruling on Vikulin's application, including that Vikulin's application for asylum was time-barred; the incidents of extortion, harassment, and harm Vikulin suffered did not rise to the level of persecution; Vikulin failed to establish that the government of Kazakhstan would be unable or unwilling to protect him; and that Vikulin's fear of future persecution was not objectively reasonable because Vikulin provided no evidence to corroborate that individuals were attacked upon arrival to the airport or that his assailants were still awaiting his return 16 years later. Vikulin challenged these findings on appeal to the BIA, but because, as discussed further in this opinion, the BIA found other issues dispositive of Vikulin's application, it declined to address these other issues. To the extent Vikulin seeks to challenge any of the IJ's findings on those issues in the instant appeal, those issues are not before us. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016) ("We do not consider issues that were not reached by the BIA.").

of status based on an approved immigrant visa petition that his mother had filed on his behalf.

Upon review, the BIA affirmed the IJ's decision, dismissed Vikulin's appeal, and granted his motion for remand for the IJ to consider Vikulin's application for adjustment of status. Specifically, the BIA agreed with the IJ's determination that Vikulin had not established that he had been persecuted or had a well-founded fear of future persecution on account of a statutorily protected ground. The BIA reasoned that the record supported the IJ's finding that the individuals who targeted Vikulin were criminally motivated, the targeting was not based on animus towards Vikulin's Russian ethnicity, and private acts of violence or criminal activity do not constitute persecution on account of a statutorily protected ground. Additionally, the BIA agreed with the IJ's determination that Vikulin failed to demonstrate that he could not reasonably relocate within Kazakhstan. The BIA concluded that these matters were dispositive of Vikulin's claim for asylum and withholding of removal. With regard to Vikulin's CAT claim, the BIA agreed with the IJ that the evidence did not establish that Vikulin would more likely than not suffer torture by, or with the acquiescence of, the government.

Following a hearing on remand, the IJ denied Vikulin's application for adjustment of status, concluding that Vikulin failed to demonstrate good moral

9

character. The IJ remarked that he was "troubled" by the appearance that Vikulin had attempted to manipulate the immigration system to his advantage, noting that Vikulin knew his immigration status was tied to his being a student and yet he knowingly left school. The IJ also noted that Vikulin had "several brushes with the law" since entering the United States, including two DUIs, a revocation of probation due to a positive drug test, and a recent possession of cocaine charge.[2]

Vikulin appealed the IJ's denial of his application for adjustment of status to the BIA. While this appeal was pending, he filed a new motion to remand with the BIA, asserting that a remand of his application for adjustment of status was appropriate in light of new evidence that the Alabama case for possession of cocaine had been dismissed because the state had failed to produce the evidence against him after more than two years. Vikulin noted that his criminal history was a significant factor in the IJ's decision to deny his application; thus, remand was appropriate because the dismissal of the Alabama charge could possibly change the outcome.

The BIA denied Vikulin's application for adjustment of status, dismissed his appeal, and denied his motion for remand. The BIA noted that the grant or denial

---

[2] During the hearing on Vikulin's application for adjustment of status, the government established that he was arrested in Alabama in 2017 for possession of a substance believed to be cocaine, but that the case was still open because Vikulin contested that the substance was cocaine and lab testing of the substance had yet to be completed.

10

of an application for adjustment of status is a matter of discretion, and in making the discretionary determination, it balances the alien's positive and negative factors to determine whether granting relief is in the best interest of the United States. And, in Vikulin's case, the adverse factors—including his 15-year immigration history in removal proceedings based on his failure to maintain his student status, his failure to abide by the terms of his voluntary departure, and his failure to seek to extend his voluntary departure status or seek relief from removal until after an arrest in 2010, his DUIs in 2001 and 2011, and a 2012 violation of probation based on a positive drug test for cocaine—outweighed the positive factors—including his entering the United States lawfully, consistent employment history, paid income taxes, and substantial family ties to the United States, among others. Accordingly, the BIA denied his application for adjustment of status.

Regarding the motion for remand, the BIA concluded that remand was not warranted because the adverse factors still outweighed the positive factors even without consideration of the 2017 Alabama arrest for cocaine possession. Accordingly, the BIA denied the motion to remand. This appeal followed.

## II.    Discussion

### A.    Application for asylum, withholding of removal and CAT relief

We review only the decision of the BIA, except to the extent that it adopts the IJ's decision or expressly agrees with the IJ's reasoning. *Gonzalez v. U.S. Att'y*

*Gen.*, 820 F.3d 399, 403 (11th Cir. 2016).  When the BIA explicitly agrees with the findings of the IJ, we will review the decisions of both the BIA and the IJ as to those issues.  *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010).

We review conclusions of law *de novo* and factual determinations under the substantial evidence standard.  *Gonzalez*, 820 F.3d at 403.  Under the substantial evidence standard, we review the evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision.  *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236 (11th Cir. 2006).  The agency's decision will be affirmed "if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'"  *Id.* (quoting *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005)).  We cannot "reweigh the evidence from scratch" and will reverse findings of fact "only when the record compels a reversal."  *Id.* (quotation marks omitted).

A petitioner seeking asylum must present specific, credible evidence that establishes either (1) that he was persecuted in the past "on account of race, religion, nationality, membership in a particular social group, or political opinion," or (2) that he has a "well founded fear" of persecution in the future "on account of" any of those enumerated grounds.  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1); *Sanchez Jimenez v. U.S. Att'y. Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007).

The applicant must show a nexus between the alleged persecution and a protected status, *i.e.*, "that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least *one central reason* for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added). To show a nexus, the alien must "present specific, detailed facts showing a good reason to fear that he . . . will be singled out for persecution on account of" the statutorily protected ground. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation and emphasis omitted).

If the alien demonstrates that he was subject to past persecution, he is "presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 208.13(b)(1). But where the alien has not demonstrated past persecution, to establish a well-founded fear of persecution, he "must prove (1) a subjectively genuine and objectively reasonable fear of persecution, that is (2) on account of a protected ground." *Silva*, 448 F.3d at 1236 (quotation omitted).

To qualify for withholding of removal under the INA, an alien must demonstrate that, if removed to his country, his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3). The alien must show that it is "more likely than not" that he will be persecuted or tortured upon returning to his country. *Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1331

13

(11th Cir. 2011) (quotation marks omitted).  Generally, if a petitioner is unable to meet the standard of proof for asylum, he will be precluded from qualifying for withholding of removal.  *Id.*

To be eligible for CAT relief, an alien must show that he will, more likely than not, be tortured if removed to his country of removal by or at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity.  8 C.F.R. §§ 208.16(c)(2), 208.18(a)(1).

Vikulin argues that he is eligible for asylum and that he established that he was targeted on account of his Russian ethnicity.  In support, he points to his testimony and that of his parents that, since the dissolution of the Soviet Union, Russians have been repeatedly targeted by Kazakh nationals.

Both Vikulin and his parents testified that Russian nationals have suffered generalized discrimination and persecution in Kazakhstan since the dissolution of the Soviet Union.  However, when testifying about specific past harms Vikulin suffered between 1998 and 2000, their testimony established that the threats, harassment, and beatings were because the assailants wanted to extort money from Vikulin due to the fact they knew that his mother was working in the United States.  Evidence consistent with acts of private violence, or that merely shows that the petitioner was the victim of criminal activity, does not establish a nexus between a protected ground and the alleged persecution.  *See, e.g.*, *Ruiz v. Att'y Gen.*, 440

14

F.3d 1247, 1258 (11th Cir. 2006) (holding that the petitioner failed to establish a nexus between her political opinion and alleged persecution by a guerrilla group because the evidence established that she was harassed due to her refusal to cooperate with the group); *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310–11 (11th Cir. 2013) (holding that the record established that the harm the applicant's family members suffered was due to their failure to cooperate with drug traffickers or that that they were victims of criminal activity, and, therefore, the applicant failed to show that the harm he feared was on account of a protected ground). Additionally, while it is undisputed that Vikulin suffered a particularly severe beating that resulted in a broken jaw and a hospital stay because he refused to pay the assailants money, it is not enough to show that he was or will be persecuted due to his refusal to cooperate with the criminals. *See Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004). Rather, Vikulin must establish that the alleged persecution is motivated, at least in part, by a protected ground. *Id.*; *see also I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (holding that central to the asylum statute is that persecution must be on account of a statutorily protected ground, making the assailant's "motive critical"). Vikulin failed to provide any evidence, other than his own speculation, that the assailants' actions towards him were motivated by his Russian ethnicity. Thus, substantial evidence supports the BIA's conclusion that Vikulin failed to establish persecution on account of a statutorily

15

protected ground.  *See Rivera v. U.S. Att'y Gen.*, 487 F.3d 815, 823 (11th Cir.

2007) (holding that, even where other inference as to the assailants' motives may

be drawn, "it is not our task to do so as long as substantial evidence supports the

[BIA's] conclusion." (quotation omitted)).  Accordingly, Vikulin failed to meet the

standard for asylum relief.[3]

Although Vikulin argues that he is eligible for withholding of removal and

CAT relief, because he failed to meet the standard for asylum, it follows

necessarily that he cannot meet the higher standard for withholding of removal or

CAT relief.  *Carrizo*, 652 F.3d at 1331;  *Forgue*, 401 F.3d at 1288 n.4 ("Because

Forgue has failed to establish a claim of asylum on the merits, he necessarily fails

to establish eligibility for withholding of removal or protection under CAT."); *Al*

*Najjar v. Ashcroft*, 257 F.3d 1262, 1292–93, 1303 (11th Cir. 2001) (holding that

because the applicants "failed to demonstrate a 'well-founded fear of persecution'

sufficient to support an asylum claim, they likewise cannot establish 'torture'

sufficient to warrant relief under CAT" because the burden of proof under the

Convention "is higher than the burden imposed on the asylum applicant").

---

[3] To the extent Vikulin argues that the evidence was sufficient to establish a pattern or practice of persecution against Russian nationals in Kazakhstan, this claim is unexhausted, and we lack jurisdiction to consider it.  *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1249–50 (11th Cir. 2006) (explaining that we lack jurisdiction to consider claims in a petition for review that were not raised before the BIA).  Additionally, because we conclude that substantial evidence supports the BIA's conclusion that Vikulin failed to establish persecution on account of a statutorily protected ground, we decline to consider Vikulin's argument that the BIA erred in concluding that he could reasonably relocate to avoid persecution.

Finally, Vikulin maintains that the BIA violated his due process rights when it failed to consider all of the issues he raised on appeal from the IJ's decision. We disagree. "To establish due process violations in removal proceedings, aliens must show that they were deprived of liberty without due process of law, and that the asserted errors caused them substantial prejudice." *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1341–42 (11th Cir. 2003). As we have previously emphasized, the BIA is "not required to address specifically each claim the petitioner made or each piece of evidence the petitioner presented, but [it] must consider the issues raised and announce [its] decision in terms sufficient to enable a reviewing court to perceive that [it] ha[s] heard and thought and not merely reacted." *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010) (quotation omitted). In Vikulin's case, the IJ provided multiple grounds for denying his application for relief from removal and Vikulin challenged many of these grounds on appeal to the BIA. The record establishes that the BIA expressly considered whether Vikulin was eligible for each form of relief sought and agreed with the IJ that he had not met his burden of establishing that he was entitled to relief. Although the BIA did not address every one of the IJ's findings that Vikulin challenged, it did not need to do so because it determined that other grounds were dispositive of his application. The BIA gave a sufficient explanation for its decision that demonstrated that it gave reasoned consideration to Vikulin's claims. As a result, Vikulin cannot show that the BIA's

17

failure to address the other findings he challenged "deprived [him] of liberty without due process of law," and "caused [him] substantial prejudice." *Lonyem*, 352 F.3d at 1341–42.

### B.    Application for adjustment of status and motion to remand

Pursuant to 8 U.S.C. § 1252(a)(2)(B)(ii), we lack jurisdiction to review the BIA's discretionary decision regarding adjustment of status.[4]  Nevertheless, we may review constitutional questions and questions of law.  8 U.S.C. § 1252(a)(2)(D).  However, we have jurisdiction only over genuine, colorable constitutional or legal claims, and "a party may not dress up a claim with legal or constitutional clothing to invoke our jurisdiction."  *Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1272 (11th Cir. 2020) (*en banc*).  An argument couched as a legal question that essentially challenges the BIA's or IJ's weighing of evidence is a "garden-variety abuse of discretion argument" that does not state a legal or constitutional claim.  *Fynn v. U.S. Att'y Gen.*, 752 F.3d 1250, 1252–53 (11th Cir.

---

[4] The BIA has discretion to grant an adjustment of status to an alien who was "inspected and admitted or paroled into the United States" "if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed."  8 U.S.C. § 1255(a).  The burden is on the alien to establish that he warrants relief as a matter of discretion.  8 U.S.C. § 1229a(c)(4)(A)(ii).  In making its discretionary determination, the BIA and the IJ are "not bound by an inflexible test in determining whether to grant [adjustment of status] as a matter of discretion."  *Cobourne v. I.N.S.*, 779 F.2d 1564, 1566 (11th Cir. 1986).  Rather, the BIA and IJ should balance the alien's positive and negative factors, and it can accord more weight to certain factors over others.  *Id.* at 1566–67; *Matter of C-V-T-*, 22 I. & N. Dec. 7, 11 (BIA 1998).

2014) (quotation omitted). Vikulin argues that the BIA violated his due process rights in denying his application for adjustment of status when it failed to use the positive factors present in his case to offset the negative ones. We have held previously that this type of claim, although couched in due process terms, does not state a colorable constitutional claim and instead is a challenge to the BIA's exercise of its discretion. *See Arias v. U.S. Att'y Gen.*, 482 F.3d 1281, 1284 (11th Cir. 2007). Therefore, we have no jurisdiction to consider it. *Id.*; *see also Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1253 (11th Cir. 2008) ("Adjustment of an alien's status . . . is a discretionary form of relief. . . . Because [an alien] has no constitutionally protected interest either in the granting of his motions or in adjustment of status, he cannot establish a due process violation based on the BIA's decisions."). Accordingly, we dismiss this portion of Vikulin's petition.

Lastly, Vikulin argues that the BIA abused its discretion in denying his motion to remand his application for adjustment of status so that the IJ could consider the new evidence of the dismissal of the Alabama drug possession charge. We review a motion to remand that seeks to introduce new evidence for an abuse of discretion. *Chacku v. U.S. Att'y Gen.*, 555 F.3d 1281, 1286 (11th Cir. 2008). "This review is limited to determining whether the BIA exercised its discretion in an arbitrary or capricious manner." *Zhang v. U.S. Att'y Gen.*, 572 F.3d 1316, 1319 (11th Cir. 2009).

19

The denial of Vikulin's motion to remand was not an abuse of discretion. The BIA reasoned that, even without taking into consideration the Alabama arrest, the adverse factors still outweighed the positive factors, and a favorable exercise of discretion was not warranted.  Thus, remand was not warranted under the circumstances and the BIA did not "exercise[] its discretion in an arbitrary or capricious manner."  *Id.*

## III.    Conclusion

In light of the foregoing, we dismiss the portions of the petition over which we lack jurisdiction and deny the rest of the petition.

**DISMISSED IN PART, DENIED IN PART**.